UNITED STATES of America,
Plaintiff–Appellee,

v.

John H. McCANN, III,
Defendant–Appellant.

No. 87–1291.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 5, 1987.

Decided Dec. 30, 1987.

Rehearing and Rehearing En Banc
Denied Feb. 16, 1988.

Thomas V. Wilhelm (argued), Law Offices of Louis Demas, P.C., Southfield, Mich., for defendant-appellant.

Michael Liebson (argued), Asst. U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Before MARTIN, JONES and NORRIS, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

On October 28, 1986 defendant, John H. McCann, pled guilty to several drug related charges, including a charge of conducting a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848 (1982). He was sentenced on March 11, 1987 by Judge Barbara Hackett to the maximum terms allowable for each offense, including life imprisonment for the CCE offense.[1] Since section 848 provides that all sentences imposed under that section are to be without parole, McCann's life sentence is not subject to parole.

On this appeal McCann challenges his sentence as violative of the eighth amendment in that it is disproportionate to his crime. Specifically, McCann contends that his sentence is out of proportion to sentences received by other CCE offenders in the Eastern District of Michigan, and that the district judge failed to give appropriate weight to McCann's cooperation with the government. We conclude that McCann's sentence is not so grossly disproportionate to his crime as to constitute cruel and unusual punishment and therefore affirm the sentencing decision of the district court.

## I.

John McCann first became involved in the cocaine trade sometime in the early 1980's. Prior to that time he had been a financially successful businessman with investments primarily in the coal industry. When the bottom fell out of the United States coal business in the early 1980's, McCann had to struggle to maintain the extravagant lifestyle to which he and his family had become accustomed.

After McCann's various businesses went bankrupt he turned to his brother-in-law, Stephen Hagerman, who McCann believed had the financial resources to assist in financing coal ventures in, among other places, Colombia, South America. Hagerman indicated that he would assist in financing McCann's coal ventures because Hagerman was interested in obtaining cocaine in South America. McCann made no "strenuous" objection to becoming involved in a cocaine operation, and eventually reached an agreement with Hagerman whereby Hagerman would pay McCann's expenses to set up the coal mining ventures which would then be financed out of the proceeds of the cocaine operation. As it turned out, Hagerman did not have the resources that he first thought he had, and so he requested McCann to set up a meeting with a potential investor Ronald Linaburg. The meeting was arranged and Linaburg agreed to invest $105,000 in the cocaine venture.

Now that they had working capital, Hagerman and McCann made numerous trips to South America, about ten of which involved the obtaining of substantial amounts of cocaine. The operation was run like any other business, and appears to have been quite efficient. Hagerman would make the contacts with suppliers in South America and McCann would take care of the details necessary to successfully carry out the transactions. For instance, he would arrange for transporta-

---

1. As recently amended, 21 U.S.C. § 848 states in relevant part:
§ 848. Continuing Criminal Enterprise
(a) Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 10 years and which may be up to life imprisonment....
....
(c) In the case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended, probation shall not be granted....
(d) For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—
(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—
(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
(B) from which such person obtains substantial income or resources.
21 U.S.C.A. § 848 (West Supp.1987).

tion and hotel rooms, and would hire people to bring the cocaine into the United States. On one occasion McCann agreed to pay the honeymoon expenses of a person named Daniel Stanhope, in return for Stanhope's agreement to carry 50 kilograms (over 100 pounds) of cocaine from Nassau in the Bahamas to Ft. Lauderdale, Florida.

A trip in October of 1983 to Bolivia is typical of McCann's involvement in the venture. Prior to this trip, Hagerman had arranged a contact through a Michael Canelas. It was decided that cocaine from Bolivia would be flown into Mexico and then delivered in an altered truck to Texas, where it would be picked up and delivered to Michigan (which was, by the way, the destination of most of the cocaine that Hagerman and McCann brought into the country). McCann "scouted" the locations in Mexico for the delivery of the cocaine and hired Fernando Sonobria to obtain a house to store the cocaine and to help load the cocaine into the truck. McCann also arranged for Ralph McKee to be the driver of the altered truck that would be used to carry the cocaine. Approximately 80 kilograms of cocaine were imported on this trip. McCann flew with the cocaine into Monterey, Mexico where it was packed into the altered truck and driven to Texas by McKee. Hagerman then brought the cocaine into Michigan.

McCann's last trip was in September 1984. On this occasion he flew with approximately 105 kilograms of cocaine from Bolivia to Monterey. McCann and a person named Josephine Chevarria assisted in loading the cocaine into McKee's truck. Because of the amounts of cocaine involved, McKee had to make two separate runs to Texas. Around this time McCann discovered that he was under investigation by the federal government and so he decided not to return to the United States. His wife and children joined him and, from September 1984 until early 1986, the family travelled in Europe and ultimately resided in Canada. On February 7, 1986 McCann was arrested at the border between the State of Washington and Canada in possession of false identification.

On April 11, 1986 an indictment against John McCann and 23 others including John's wife, Leah, was returned by a grand jury in the Eastern District of Michigan. McCann was charged with, among other things, one count of running a continuing criminal enterprise (21 U.S.C. § 848); one count of conspiracy to distribute cocaine (21 U.S.C. § 846) (Leah McCann was also included in this count); and five counts of possession with intent to distribute cocaine (21 U.S.C. § 841(a)(1)). Shortly thereafter McCann was indicted, along with his wife, in the Western District of Pennsylvania on three counts of tax evasion and two counts of filing false tax returns. The Pennsylvania charges were joined with the charges in the Eastern District of Michigan.

McCann's trial was scheduled to begin on October 28, 1986, before the Honorable Barbara Hackett. Just before trial, however, an agreement was reached with John McCann to terminate his case via a guilty plea. McCann agreed to plead guilty as charged to all counts against him except the drug related conspiracy charges which merged into the CCE charge. In return for his guilty plea the government agreed to dismiss the case against Leah McCann. John McCann also agreed to be fully debriefed by the government and to testify in all relevant trials. McCann was thereafter debriefed and on November 4 and 5, 1986, and on January 7 and 8, 1987, he testified for the government in the case against Alfredo Rios. Rios, who was one of Hagerman's cocaine suppliers, was eventually convicted by a jury for conspiring to import cocaine.

On March 11, 1987, McCann appeared before Judge Hackett for sentencing. McCann's plea agreement with the government contained no agreement concerning the sentence which McCann could receive as a result of his guilty plea. Prior to sentencing McCann had sent a handwritten letter to Judge Hackett in an attempt to explain and mitigate his circumstances. In that letter McCann went into the details about his life prior to his involvement with cocaine. From the letter it is apparent that McCann is a bright man who has had a number of opportunities in life. McCann

graduated first in his college class and he and his wife are both lawyers. After law school McCann was actively involved in New Jersey politics, serving as an aide to Republican Senator Frank S. Farley. McCann eventually ran for office himself, and was elected mayor of his hometown, Somers Point, New Jersey. Eventually McCann left politics to pursue a variety of business interests. He was just as successful in business as he had been in politics, and was apparently very comfortable financially until the early 1980's when the coal industry went through difficult times.

The common theme running through McCann's letter to Judge Hackett is the love he has for his wife and two teenage daughters, Erin and Meredith. According to McCann, his involvement with cocaine was motivated primarily by his concern that his family be able to maintain the lifestyle to which they had become accustomed. Indeed McCann admitted in the letter that he had "paid so much attention to [his] stature in the community and [his] reputation that [he] lost both [his] character and [his] perspective." McCann then went on in the letter to note the various legitimate businesses he had attempted to set up in South America, and stated that had any of these ventures succeeded he would have ended his involvement in the drug business. According to McCann, his "heart was never really in the drug trade." In addition to this letter, McCann's attorney filed a pre-sentence memorandum with the judge in which he argued that in light of the nature of McCann's involvement in the cocaine operation and his cooperation with the government, a ten year sentence, the minimum allowable for a section 848 violation, would be appropriate.

After considering McCann's letter, the extent of his involvement in the cocaine venture, and his cooperation with the government, Judge Hackett sentenced McCann to life imprisonment on the CCE charge and to the maximum penalties allowable on the remaining charges, all to run concurrently with the life sentence. This appeal followed.

## II.

An appellate court's review of a sentencing court's decision is characterized by utmost deference. As the Supreme Court made clear in *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), it is not normally the role of an appellate court to second-guess the trial judge's determination of an appropriate sentence. "Rather, an appellate court must determine only whether the sentence imposed is so grossly disproportionate to the crime as to constitute cruel and unusual punishment." *United States v. Darby,* 744 F.2d 1508, 1525 (11th Cir.1984) (citing *Solem,* 463 U.S. at 290 n. 16, 103 S.Ct. at 3009 n. 16). As the Supreme Court observed in *Solem,* "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Solem,* 463 U.S. at 289–90, 103 S.Ct. at 3009 (quoting *Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. at 1133, 1138, 63 L.Ed.2d 382 (1980)).

This does not, however, mean that a proportionality analysis is entirely inapplicable in non-capital cases like the one presented here. Indeed in *Solem* the Court declared unconstitutional a sentence of life imprisonment without parole. The defendant in *Solem* was charged and convicted of uttering a "no account" check for $100. Because this was defendant's seventh conviction, all for minor non-violent felonies, he was subject to South Dakota's recidivist statute and thus could be sentenced to the maximum of life imprisonment without the possibility of parole. On habeas review, the Supreme Court concluded that the life sentence the defendant received was significantly disproportionate to his crime, and therefore prohibited by the eighth amendment. *Id.* 463 U.S. at 303, 103 S.Ct. at 3016. In the course of its opinion, the Court set out three objective factors that courts should consider in conducting a proportionality analysis. These factors are:

1) the gravity of the offense and the harshness of the penalty;

2) the sentences imposed on other criminals in the same jurisdiction; and

3) the sentences imposed for commission of the same offense in other jurisdictions.

*Id.* at 290–92, 103 S.Ct. at 3009–10.

■ Not every case will require an extensive proportionality analysis using the factors set out in *Solem*. Indeed in *Solem* itself the Court suggested that in light of the deference that should be accorded legislatures and sentencing courts, "a reviewing court will *rarely* be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate." *Id.* at 290 n. 16, 103 S.Ct. at 3009 n. 16 (emphasis added). Nevertheless, in the instant case we believe an "extended analysis" is appropriate for the following reasons. First, this case, like *Solem*, involves a sentence of life without parole, a fact which on its own is perhaps enough to trigger an extended proportionality analysis. *See, e.g., Chandler v. Jones*, 813 F.2d 773, 778–79 (6th Cir.1987); *United States v. Rhodes*, 779 F.2d 1019, 1028 (4th Cir. 1985) (finding the *Solem* proportionality analysis to be required "only in those cases involving life sentence without parole"), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986). Second, this case presents certain special circumstances, particularly McCann's guilty plea and his agreement to testify against other participants in the drug operation. If only from a policy standpoint, these circumstances, when coupled with the severity of McCann's sentence, suggest the need for an extended proportionality analysis.

■ The first *Solem* factor is the gravity of the offense and the harshness of the penalty. Without question the sentence McCann received was extremely harsh. Barring executive clemency, McCann, who is 45 years old, will spend the rest of his life in prison. Nevertheless, McCann's crime was also great. The offense of engaging in a continuing criminal enterprise

is the most serious of the drug related offenses proscribed in Title 21. *Darby*, 744 F.2d at 1527. As its name suggests, section 848 is directed at the organizers and supervisors of those drug operations in which at least six persons are engaged in a "continuing series of violations" of the drug laws. 21 U.S.C.A. § 848(d) (West Supp.1987). Further, it was clearly Congress' intent that persons convicted for violating section 848 be subject to severe punishment. Indeed in passing the CCE statute, Congress noted that "[t]he illegal traffic in drugs should be attacked with the full power of the federal government. The price for participation in this traffic should be prohibitive. It should be made too dangerous to be attractive." *See United States v. Rhodes,* 779 F.2d 1019, 1029 (4th Cir.1985).[2]

In this case McCann's crime was most severe. The record confirms that the enterprise in which he was engaged was extensive and lucrative. Along with Hagerman, McCann was responsible for the importation of hundreds of kilograms of cocaine into this country. The operation extended into several foreign countries and required the involvement of a substantial number of people, many of whom McCann recruited and supervised. McCann contends that he was *only* a "logistics man" for Hagerman, suggesting that in some way this diminishes the severity of his crime. It does not. As mentioned above, the continuing criminal enterprise statute is directed at those who hold "supervisory" or "organizational" roles in drug operations. There can be no doubt that McCann held such a role. He was not a "mule" for Hagerman, but was an active, willing participant, and indeed equal partner, in this extensive drug venture. Accordingly, based on an examination of the statute and the extent of McCann's culpability, we can-

---

**2.** It should be noted that in November 1986 Congress amended section 848 to provide for a mandatory life sentence for any person who was a principal organizer, manager or supervisor of a CCE. *See* 21 U.S.C.A. § 848(b) (West Supp.1987). The government suggests that had McCann's conduct occurred after November 1986, he may well have been charged and convicted as being a primary organizer and thus subject to a mandatory life sentence. Regardless of whether this is true, the amending of section 848 clearly evinces Congress' intent to continue to harshly punish major organizers of drug operations.

not say at this point in the analysis that his sentence is disproportionate.

■ The second *Solem* factor involves a consideration of sentences imposed on other criminals in the same jurisdiction. McCann argues that the "same jurisdiction" for these purposes is the Eastern District of Michigan. This interpretation of *Solem* is too narrow. Rather, a court applying this second factor must consider the sentences imposed not just in one particular judicial district but in the jurisdiction of the United States as a whole. *See Darby*, 744 F.2d at 1528.[3]

Comparing McCann's life sentences with other sentences imposed under section 848 demonstrates that there is no significant disparity. Congress has indicated an intent to punish CCE defendants severely, and for the most part the federal courts have imposed sentences consistent with this intent. Indeed on several occasions, both before and after *Solem* was decided, appellate courts have upheld sentences of life without parole for section 848 violations. *See United States v. Erwin*, 793 F.2d 656 (5th Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986); *United States v. Lewis*, 759 F.2d 1316 (8th Cir.1985); *Williams v. United States*, 731 F.2d 138 (2d Cir.1984); *United States v. Barnes*, 604 F.2d 121 (2d Cir.), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *United States v. Jeffers*, 532 F.2d 1101 (7th Cir.1976), *rev'd on other grounds*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). Furthermore, prison sentences of a substantial term of years, although less than life, have been upheld for CCE offenders on several occasions. *See United States v. Rhodes*, 779 F.2d 1019 (4th Cir.1985) (defendants who were 42 and 38 years old respectively, received prison terms of 50 years and 75 years respectively); *United States v. Harrington*, 761 F.2d 1482 (11th Cir.1985) (defendant, in mid–30's, received

a 40 year prison term); *United States v. Darby*, 744 F.2d 1508 (11th Cir.1984) (defendants, both over 45 years old, received 60 year prison terms). Indeed, all of the courts that have considered challenges to lengthy sentences under section 848 have upheld the sentences as being within constitutional limits.

■ McCann makes much of the fact that the average sentence imposed for a CCE offender in the Eastern District of Michigan is only 19.4 years. Specifically, McCann points to the sentences imposed in three recent cases in the district. In those three cases the defendants each pled guilty to CCE violations pursuant to Rule 11 agreements setting the maximum sentence at 10 years. While it is true that these sentences were substantially less severe than that received by McCann, this fact does not require the district court's sentencing decision to be set aside. In the first place, the government was willing in those three cases to enter into agreements with the respective defendants involving sentencing. The government was not willing to enter into such an agreement here, and so when McCann pled guilty he took a chance that the judge would impose the maximum sentence allowable for his offense. Further, the fact that some defendants have been treated less harshly by prosecutors and by courts is an argument that can always be made with respect to sentencing decisions, which by their very nature are inherently discretionary and unavoidably tied up with the facts and circumstances of the particular case. Only when a sentence is so out of proportion to the offense that it can be said without question that the sentencing court abused its discretion, will a sentence be set aside on appeal. As the above review of cases from federal jurisdictions indicates, the sentence in this case is not disproportionate in light of the number of actual life sentences and functional life sentences which have been given in other CCE prosecutions.

---

3. This interpretation comports more closely with the teaching of *Solem*. In *Solem* the Court was concerned with the proportionality of a sentence imposed pursuant to a *state* statute. Accordingly, in considering the second factor the Court found it appropriate to look at sentences imposed by courts throughout the entire

state of South Dakota. In this case, by contrast, we are concerned with the proportionality of a sentence imposed pursuant to a *federal* statute. Accordingly, it is necessary and appropriate to look at sentencing judgments made by the courts that interpret that statute—*i.e.*, the courts in the entire federal system.

McCann also argues that his cooperation with the government, specifically his testimony against Alfredo Rios, distinguishes his case from those in which life sentences without parole have been upheld. More specifically, McCann argues that the district court had an obligation to consider his cooperation favorably in passing sentence upon him. McCann, however, does not cite a single case that supports this contention. The cases he cites merely suggest that it is appropriate for a court to consider a defendant's *failure to cooperate* in handing down a harsh sentence. *See Roberts v. United States*, 445 U.S. 552, 558, 100 S.Ct. 1358, 1363, 63 L.Ed.2d 622 (1980). Nowhere is it suggested that a district court has an affirmative obligation to favorably consider a willingness to cooperate. In this case Judge Hackett evaluated McCann's cooperation and concluded that it was not a mitigating factor in light of his failure to appreciate his full guilt. This conclusion was well within her discretion. Indeed, McCann's "cooperation" was not as extensive as he suggests. Rather than turning himself in to the government once he knew that he was under investigation, McCann fled the country and spent well over a year trying to avoid having to answer for his crimes. It was only after he was indicted and the government was prepared to go to trial against him that McCann came forward and agreed to testify against Rios. And this cooperation did not go unrewarded. By pleading guilty and testifying for the government, McCann was able to get the government to agree to drop the charges pending against his wife. Under these circumstances, we do not believe that the fact of McCann's cooperation requires us to distinguish his case from those in which similar sentences have been upheld for CCE offenders.

The final *Solem* factor relates to sentences imposed for the commission of the same crime in other jurisdictions. As the court in *Darby* noted:

> [d]ue to the unique nature of section 848, consideration of this factor is difficult if not impossible. [G]iven the key role played by the continuing criminal enterprise provision in the federal drug enforcement scheme and the unparalleled comprehensiveness of that scheme, it is doubtful that "the same crime" exists in "other jurisdictions."

744 F.2d at 1529. Nevertheless, we note that if McCann had been tried under state jurisdiction in Michigan for the same offenses, he would have received a mandatory sentence of life without parole. *See* Mich.Comp.Laws Ann. § 333.7401 (West 1980). Indeed all that was required to obtain that life sentence was the distribution of 650 grams of cocaine (less than one kilogram). Thus McCann could have received a mandatory life sentence in Michigan for activities substantially less blameworthy than the hundreds of kilograms of cocaine he was actually responsible for. *See also Darby*, 744 F.2d at 1529.

On the basis of the foregoing analysis, we conclude that McCann's sentence is not so grossly disproportionate to his crime as to violate the eighth amendment. The sentence is within the statutory limits and Judge Hackett did not abuse her discretion in imposing it. Accordingly we AFFIRM the judgment of the district court. While we express no opinion as to whether reduction of this sentence would be appropriate pursuant to Fed.R.Crim.P. 35(b), nothing in our disposition of this case should be interpreted as precluding the district court from entertaining such a motion.