**UNITED STATES of America, Plaintiff,**

v.

**Nelson Lemas GOMEZ, Defendant.**

**Crim. No. 88–80705.**

United States District Court,
E.D. Michigan, S.D.

Nov. 28, 1989.

Robert W. Donaldson, U.S. Attorney's Office, Detroit, Mich., for plaintiff.

Juan A. Mateo, Detroit, Mich., for defendant.

## AMENDED SENTENCING MEMORANDUM AND ORDER *

COHN, District Judge.

### I.

On October 4, 1989, the Court sentenced defendant to concurrent 30–year terms on his jury conviction of conspiracy to possess with intent to distribute cocaine, 21 U.S.C. § 841(a)(1) and 846, and for possession with intent to distribute five kilograms or more of cocaine, 21 U.S.C. § 841(a)(1). In imposing the sentences, the Court rejected the government's recommendation of a life-without-parole sentence, noting that defendant, under the Court's sentences, was not eligible for parole and would have to serve the full 30 years less credits for satisfactory behavior.

On reflection, the Court is satisfied the sentences were too long and *sua sponte*, pursuant to Fed.R.Crim.P. 35, reduces the sentences to concurrent 22–year terms. The reasons for the Court's actions follow. They are a revision of and a substitution for the Court's bench comments at the time of sentencing.

---

* This Amended Memorandum incorporates as appendix 1 an article which came to the Court's attention after the issuance of the original Sentencing Memorandum. The article amplifies

### II.

Defendant is a national of Colombia. He is probably in this country illegally and will likely be deported on his release. He was convicted for his participation in a complicated scheme to smuggle into this country 576 kilograms of cocaine and 16,300 pounds of marihuana from Colombia. The scheme was actually a sting, set up by the Drug Enforcement Administration, that involved a DC–6 aircraft transporting the contraband from Colombia to Grosse Ile, Michigan. After the aircraft landed in September, 1987, the contraband was removed to two warehouses in Dearborn, Michigan, where a number of the participants were arrested. The defendant was consignee of 400 kilograms of the cocaine, which he apparently intended to distribute along the eastern seaboard. Defendant was previously implicated in the distribution of approximately 80 kilograms of cocaine but never convicted. In the Court's view, defendant is a long-time, sophisticated drug trafficker with connections running directly to the Medelin Cartel.

The participants arrested in September, 1987 pleaded guilty and received varying custodial terms ranging from 20 years to 12 years to shorter terms. Defendant was indicted on October 10, 1988, about a year after the scheme was thwarted, when the government was first able to induce confederates to testify against him. He is the only participant who did not plead guilty and who did not cooperate with the government. Defendant insists, however, that his offers of cooperation were rejected by the government.

### III.

The government recommended a life-without-parole sentence on the grounds that "it is only fair and just that the defendant, because of the size of his operation, his culpability in the instant offense, and his position with the Colombia drug dealing cartel, should be sentenced by this court to

---

the concerns expressed in the Memorandum with regard to the problems created by the growing class of geriatric prisoners.

the maximum penalty allowable under the statute." Government's Sentencing Memorandum at 4. The government supported its recommendation by noting, had the amount of cocaine been only five kilograms, the minimum sentence required by law is 10 years. The government also urged that the Court impose a life-without-parole sentence because the defendant possessed more cocaine than the amount that triggers a life-without-parole sentence for a conviction of involvement in a continuing criminal enterprise under 21 U.S.C. § 848(b). In addition, the government cited the Michigan statute that mandates a life-without-parole sentence for possession with intent to deliver 650 grams or more of cocaine, Mich.Comp.Laws Ann. § 333.7401(2)(a)(i), again noting that the defendant possessed more than the statutory amount.

Defendant, without suggesting any specific sentence, argued that the government's recommendation was excessively harsh given the sentences imposed on other participants in the scheme, the level of defendant's culpability in the conspiracy, as well as his family situation and lack of prior convictions.

## IV.

### A.

Life-without-parole is the penultimate sentence, *Solem v. Helm*, 463 U.S. 277, 303, 103 S.Ct. 3001, 3016, 77 L.Ed.2d 637 (1983). Most of the states whose criminal law allows for such a sentence have adopted it as a surrogate for the death penalty, primarily to save the expense and time so frequently occasioned by that sentence. Such a sentence should be imposed only for the severest of crimes and in the rarest of circumstances. While there are a multitude of federal criminal statutes that allow for or mandate a life sentence, it appears that most of them concern drug-related crimes.

### B.

Congress first began setting minimum sentences for drug-related crimes in 1951.

In 1956, Congress eliminated parole for certain of those crimes. In *Warden v. Marrero*, 417 U.S. 653, 661–62, 94 S.Ct. 2532, 2537, 41 L.Ed.2d 383 (1974), the Supreme Court discussed a predecessor statute to 21 U.S.C. § 841(a) that provided for no parole:

> [T]he legislative history of [the statute] reveals that Congress meant ineligibility for parole to be treated as part of the "punishment" for the narcotics offenses for which respondent was convicted. [The statute] was enacted as part of the Narcotic Control Act of 1956. The statute embodied congressional acceptance of the approach that effective combat against the contagion of drug addiction required the imposition of severe penalties for certain narcotics offenses. Congress therefore enacted lengthy mandatory minimum sentences as a means of decreasing both drug addiction and trafficking.... But Congress believed that longer sentences would not achieve the desired results unless the offender remained imprisoned for his full term.
>
> > In evaluating the effectiveness of the presently prescribed penalties, it must be recognized that special incentives in our penal system serve to decrease the actual time spent in a penal institution under a sentence imposed by a court. The violator is eligible for parole after serving one-third of his sentence.... Available data from the Bureau of Prisons, indicates that a narcotics violator actually serves an average of less than two-thirds of the sentence imposed by the court. This mitigation of the sentence tends to defeat the purposes of [existing legislation]....
>
> [H.R.Rep. No. 2388, 84th Cong., 2d Sess., 10–11 (1956).]

Congress' attitude about no parole and a mandatory minimum sentence for drug offenses softened in 1970, when the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91–513, 84 Stat. 1236, was enacted. Ironically, this is the same statute that first gave federal judges discretion to impose a life-without-parole sentence for involvement in a continuing criminal enterprise, 21 U.S.C.

§ 848. By adopting the statute, Congress set the range of sentencing options for conviction of such a crime between a minimum of 10 years and a maximum of life-without-parole depending on particular circumstances. In eliminating a mandatory minimum for conviction of possession with intent to distribute cocaine, Congress said:

> The foregoing sentencing procedures give maximum flexibility to judges, permitting them to tailor the period of imprisonment, as well as the fine, to the circumstances involved in the individual case.
>
> The severity of existing penalties, involving in many instances minimum mandatory sentences, have led in many instances to reluctance on the part of prosecutors to prosecute some violations, where the penalties seem to be out of line with the seriousness of the offense. In addition, severe penalties which do not take into account individual circumstances, and which treat casual violators as severely as they treat hardened criminals, tend to make convictions somewhat more difficult to obtain. The committee feels, therefore, that making the penalty structure in the law more flexible can actually serve to have a more deterrent effect than existing penalties, through eliminating some of the difficulties prosecutors and courts have had in the past arising out of the minimum mandatory sentences.

H.R.Rep. No. 1444, 91st Cong., 2d Sess., *reprinted in* 1970 *U.S.Code Cong. & Admin.News* 4566, 4576.

In enacting the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207, Congress reversed itself and hardened its attitude toward drug trafficking, amending 21 U.S.C. § 841(b) to extend the range of a sentence for violation of the statute from a minimum of 10 years to a maximum of life-without-parole for a first time conviction of possession with intent to distribute five kilograms or more of cocaine. Prior to the 1986 amendment, the penalty for possession with intent to distribute 100 grams or more of cocaine ranged from probation to not more than 15 years with parole eligibility. Strangely, there was no House or Senate report accompanying the Anti–Drug Abuse Act of 1986 to explain the change in Congress' attitude. Perhaps Congress envisioned that the newly created Sentencing Commission would establish criteria for a life-without-parole sentence so that federal judges, rather than exercising unfettered discretion, would exercise guided or structured discretion in imposing such a sentence. This is only speculation. The legislative history, as the Court has examined it, simply does not provide any insight into Congress' intentions in increasing the maximum sentence that may be imposed for conviction under 21 U.S.C. § 841(a) to life-without-parole. Insofar as the sentencing guidelines are concerned, the maximum sentence which can be imposed for possession with intent to distribute cocaine, regardless of amount and without embellishment, for a first time conviction, is 235 months.

The literature on life-without-parole sentences is silent as to the factors that should inform a judge's discretion. *See, e.g.,* Cheatwood, *The Life–Without–Parole Sanction: Its Current Status and a Research Agenda,* 34 Crime & Delinquency 43 (1988); Stewart & Lieberman, *What Is This New Sentence That Takes Away Parole?,* Student Lawyer, Oct. 1982, at 14; Wright, *Life–Without Parole: An Alternative To Death or Not Much of A Life At All?,* 43 Vand.L.Rev. (1990) (student note to be published next year).

There are two Sixth Circuit cases dealing with the constitutionality, under the Eighth Amendment, of a life-without-parole sentence on a conviction for drug trafficking. While they confirm the rule that the selection of a sentence within the statutory range is essentially free of appellate review, *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974), they offer little insight into the factors which should go into the imposition of such a sentence. In *Young v. Miller,* 883 F.2d 1276 (6th Cir.1989), the Michigan life-without-parole statute cited above was held constitutional against an attack on the grounds of disproportionality. In *United States v. McCann,* 835 F.2d 1184 (6th Cir.

1987), a life-without-parole sentence for a conviction, albeit a guilty plea, under 21 U.S.C. § 848 was held not to be so grossly disproportional as to violate the Constitution. Interestingly, both of the Sixth Circuit panels that sat in the two cases suggested that the sentence imposed was too severe for the circumstances of the case and suggested either executive clemency or a reduction under Fed.R.Crim.P. 35. *Young, supra* at 1285–86; *McCann, supra* at 1190.

Neither the circumstances nor the comments at sentencing in connection with two life-without-parole sentences imposed in this district in recent years offer any assistance in marking out the circumstances to be considered in imposing a sentence that confines a person to prison without any mechanism for release, regardless of future circumstances, except Presidential action. And there is nothing in the literature or legislative history of the statutes that eliminate parole to remotely suggest that the possibility of Presidential action at some future date was a Congressional consideration. Judge Easterbrook's statement in *United States v. Jackson*, 835 F.2d 1195, 1197 (7th Cir.1987)—"If the sentence be unduly harsh, the holder of the executive power may supply a remedy"—is simply too facile. *See* K. Moore, *Pardons: Justice, Mercy and the Public Interest* 211–28 (1989); Joyner, *Rethinking the President's Power of Executive Pardon*, Federal Probation, March 1979, at 16.

Little is known of the public or personal consequences of a life-without-parole sentence. Statistics as to the number of such sentences are not readily available. The most recent reports of the Bureau of Prisons and of the Sentencing Commission make no mention of such sentences. *See United States Sentencing Commission: Annual Report 1988;* Federal Bureau of Prisons, U.S. Dep't of Just., *1988 State of the Bureau.* Prison overcrowding, the problems of a geriatric prison population, and the development of a class of super-inmates are all likely consequences. *See* Wilson & Vito, *Long Term Inmates: Special Needs and Management Considerations,* Federal Probation, Sept. 1988, at 21.

The Court has found only one decision that discusses, in a meaningful way, some of the considerations that should obtain when a judge considers confining a 40–year-old man to prison for the rest of his life. In *Jackson, supra,* the Court of Appeals for the Seventh Circuit examined a life-without-parole sentence that had been imposed on a habitual bank robber and was being attacked as not authorized by law. The Court of Appeals rejected the attack. Judge Posner concurred even though he thought the sentence too harsh and went on to say:

> To suppose that if Jackson is fortunate enough to live on in prison into his seventies or eighties it would still be necessary to detain him lest he resume his life of crime after almost a lifetime in prison is too speculative to warrant imprisoning him until he dies of old age. [The 10–year sentence recommended by the probation officer] may well be too short, but it is some indication that imprisonment for the rest of Jackson's life is too long if the only concern is with the crimes he might commit if he were ever released.
>
> The remaining possibility is that this savage sentence is proper *pour encourager les autres.* Indeed, deterrence is the surest ground for punishment, since retributive norms are so unsettled and since incapacitation may, by removing one offender from the pool of offenders, simply make a career in crime more attractive to someone else, who is balanced on the razor's edge between criminal and legitimate activity and who now faces reduced competition in the crime "market." ...
>
> . . . .
>
> ... A civilized society locks up such people until age makes them harmless but it does not keep them in prison until they die.

*Id.* at 1199–1200. The Court agrees.

## V.

In most instances of a multidefendant crime, the first sentence imposed is usually the benchmark by which subsequent sentences are determined. This is to avoid the

vice of unwarranted disparity. The highest sentence imposed on a participant in the conspiracy of which defendant was a part is 20 years. The defendant was perhaps the most culpable of the participants. He had a central role. He has been involved in drug trafficking for a long time. There were intimations of intimidation of witnesses at trial. The defendant is now about 40 years old. Concurrent 22–year sentences will confine him until age 55, providing he behaves himself while he is in custody. At that age, he will probably be sent back to Colombia. Even if he stays in the United States, he is unlikely to cause further trouble.

Initially, the Court was satisfied that concurrent 30–year sentences were consistent with principles of retribution, the public interest in punishment, incapacitation and general deterrence, and discouragement of others. The Court felt that any longer term was unnecessary and inappropriate. Given a deeper understanding of the guideline requirements for drug trafficking, the Court has modified its thinking. There is little difference regarding a man's capabilities at age 55 as at age 60 in the Court's view. Accordingly, it meets the needs of justice to keep defendant in custody until age 55, which is the likely result of concurrent 22–year terms.

SO ORDERED.

## APPENDIX 1

## JUSTICE

---

### GROWING OLD BEHIND BARS

---

### Some cellblocks are more nursing home than jail

---

NEWSWEEK: NOVEMBER 20, 1989

On a steamy June day in 1973, a 50–year–old drifter named Quenton Brown robbed a bread store in Morgan City, La., of $117 and a 15–cent cherry pie. He walked across a dusty street, crawled under a house and ate the pie. When the police showed up a few minutes later, he surrendered his .38 pistol and the handful of money without resistance. Brown, whose IQ is 51, told the cops he had bummed his way to the Cajun outback to find work on an oil rig. Unable to find a job, he robbed. The jury gave short shrift to his claim of insanity. The judge gave him 30 years without parole.

Brown has pulled 17 years in the Louisiana State Prison at Angola, one of the nation's toughest. At 67, he is feeble, suffering from emphysema, a crushed esophagus and bleeding ulcers. His prison record is free of all but minor infractions, none involving drugs, sex or violence. He holds the highest inmate security rating, Class–A trusty. Over the years, he has watched former death-row murderers walk to freedom while his bids for release have been repulsed. As he grows older, the worst part of doing time is the younger, bolder prisoners: "They call you names. You go to the prison store, they snatch the bags from your hands as you leave. You're living in a jungle among savages."

Brown represents a growing problem in prisons across the country: the care and confinement of aging criminals. The number older than 55 has topped 20,000—including more than 400 over age 85—and it is doubling every four years. While older prisoners still constitute a small proportion of total prison population, they are among the fastest-growing segments. "In 20 years," says Sol Chaneles of Rutgers University, "we will rename prisons Centers for the Treatment of Old Folks."

That promises to be a costly proposition. The average expense of medical care and maintenance for inmates over 55 is $69,000 a year, about three times the norm. As with any aging group, their incidence of chronic illness increases, especially for ailments such as heart disease, emphysema, cancer and stroke. They require special diets, more eyeglasses, hearing aids, dentures and prosthetics. Prisons must replace uniform buttons and shoelaces with Velcro patches to accommodate arthritic fingers.

Long-termers account for about half the population over 55, studies show. The other half committed crimes later in life. But except for child molesters, whose criminal inclinations usually do not abate, criminologists believe that the older prisoners are less likely to become repeat offenders if released. A Bureau of Justice Statistics report this year found age the single most reliable indicator in predicting recidivism. "The older the prisoner at the time of release, the less likely he is to commit a crime," says statistician Allen Beck.

But getting released is the problem. Legislatures have imposed mandatory, longer sentences. Some parole boards have been abolished, others merely paralyzed. Pardons and commutations are as rare as ever. Jonathan Turley, a Tulane University law professor who represents Brown, argues that authorities are more reluctant to intervene for inmates because they fear political backlash, even from low-risk cases. "The system has essentially shut down," he says. "We're stuffing people in but have shut off the valves for release."

**Secure homes:** Freeing older prisoners poses more than political problems. Many have lost or outlived their families. "They may have no homes, no job skills," says Drexel University sociologist Julia Hall. "Who hires an older person anyway, much less an ex-con?" They have no savings or medical insurance, and may not know how to take advantage of welfare programs. Hall is now directing a pilot program in Pennsylvania to train parole and probation officers to meet those special needs.

Some states have responded by segregating older and handicapped prisoners in specially designated prison wings or the prison hospital. "No matter what the elderly criminals did, they don't need handcuffs, leg irons and a 30-foot wall," says sociologist Donald Newman of the State University of New York at Albany. One option, Newman suggests, is to create a system of "secure nursing homes" where inmates' movements could be monitored with electronic bracelets.

That would suit Quenton Brown just fine. "I know I don't have many more years," he says. "I'd like to spend a few of them outside prison." Brown almost beat the rap this year. At the urging of an inmate "jailhouse lawyer," he claimed that his rights had been violated by a state psychiatrist who examined him before his trial, then testified against him. The U.S. Circuit Court of Appeals in New Orleans ruled that the testimony had violated Brown's Fifth Amendment right to avoid self-incrimination but found the error "harmless." Louisiana Gov. Buddy Roemer has denied a unanimous recommendation from his parole board to commute Brown's sentence. "When I look at Quenton, I think of Jean Valjean," says Turley. "The difference is that at the end of 'Les Misérables,' Victor Hugo implied that even in the most desperate circumstances, there is meaning. Where is the meaning in allowing a broken-down old man to die in prison?" Regardless of Brown's fate, it is a question the criminal-justice system must face, now or later.

GINNY CARROLL