Jedonna YOUNG, Petitioner–Appellant,

v.

Tekla MILLER, Respondent–Appellee.

No. 88–1103.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 31, 1989.

Decided Aug. 29, 1989.

Martin A. Geer (argued), Ann Arbor, Mich., for petitioner-appellant.

Thomas A. Kulick, Atty. Gen., Corrections Div., K. Davison Hunter (argued), Asst. Atty. Gen., Lansing, Mich., for respondent-appellee.

Before KENNEDY and NELSON, Circuit Judges, and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

Petitioner Jedonna Young appeals the denial of her petition for a writ of habeas corpus filed under 28 U.S.C. § 2254. Young was convicted in a bench trial in Detroit Recorder's Court on September 13, 1979 of possession with intent to deliver six hundred and fifty grams or more of heroin, in violation of Mich.Comp. Laws § 333.7401(2)(a)(i). Pursuant to statute, she was sentenced to a mandatory term of life imprisonment without the possibility of parole. On appeal, Young asserts that (1) the district court erred in not holding an evidentiary hearing to determine whether she had received ineffective assistance of counsel; (2) the state trial court violated her due process rights under the fourteenth amendment by not severing her trial from that of her co-defendant; and (3) the mandatory life sentence without parole is so disproportionate to her crime as to constitute cruel and unusual punishment under the eighth amendment. Finding no merit in any of these three contentions, we affirm.

I.

We will briefly summarize the facts surrounding Young's drug conviction. On October 19, 1978, Detroit police officers were staking out a car wash owned by co-defendant James Gulley. Gulley left the car

wash in his GMC motor home at about 8:30 p.m., followed by four unmarked police cars. The police, however, lost sight of the motor home in the Sherwood Forest neighborhood of Detroit, only to find the vehicle parked outside a home located on Birchcrest Street. The police resumed their watch.

At approximately 10:04 p.m., petitioner Young drove up in a bronze 1978 Fleetwood Cadillac and parked it in the driveway at the Birchcrest address. Co-defendant Gulley was in the passenger seat. Both defendants left the car and walked into the house. Young opened the door with a key.

At 10:10 p.m., both defendants left the house. Young was carrying a white plastic bag. Officers saw Gulley enter the GMC motor home. At the same time, they saw Young open the trunk of the Cadillac and place the white plastic bag inside. A few minutes later, Gulley left the motor home and handed Young a black and yellow plastic bag. Young put the black and yellow bag inside the trunk and closed the trunk door. Young and Gulley reentered the Cadillac, with Young as the driver and Gulley in the passenger seat.

The police then stopped the car a short distance away. On the front seat, officers found a brown paper bag, secured with rubber bands between Gulley and Young. Inside this paper bag was heroin. In addition, police officers searched the two bags that Young had placed inside the trunk. Heroin was found inside the black and yellow bag.

At trial, a police chemist testified that the brown paper bag found on the front seat contained 498.97 grams of powder containing heroin. Inside the black and yellow bag in the trunk were two other packages: (1) one package containing twenty-two, 24 gram packets totalling 546.63 grams; (2) the other containing ten, 24 gram packets totalling 247.63 grams of heroin. Thus, approximately 1300 grams (2.88 pounds) of heroin was found in the Cadillac. Moreover, Gulley had $1,500 rolled up in his hand when he was arrested. Police also

found $14,000 in cash inside a brown bag found on the front seat of the Cadillac. Both defendants were arrested and later indicted on charges of heroin possession with intent to deliver. The government prosecuted the case against Gulley and Young jointly.

As this case involves allegations of ineffective assistance of counsel, we will review the procedural history in some detail. At a pretrial conference, held on December 7, 1978, petitioner was represented by employed attorney S. Allen Early. The trial court ordered all pretrial motions to be filed by January 4, 1979. On that date, attorney Early was granted an extension in which to file his motions. On January 19, 1979, Early filed motions to quash the indictment, to sever the trial of the defendants, and to suppress evidence. These motions were denied by the trial court on March 2, 1979. Attorney Early was unable to represent Young at trial, as he was out of the country. Substitute counsel Susan Daltuva, from the same law firm and trying her first case out of law school, took over the case at this point.

Trial began on September 5, 1979. On that day, attorney Daltuva attempted to make additional arguments on the motions to quash, sever, and suppress evidence. She also informed the trial court that Young wished to waive her jury trial. Daltuva further made a motion to disqualify the trial judge in light of Young's decision to waive her jury trial and the judge's handling of prior cases involving the drug activities of co-defendant Gulley.[1] The trial judge granted the jury waiver, but denied defense counsel's other requests as untimely. Young waived her jury trial by signing a jury waiver and acknowledging to the court that she understood her rights. Thus, in the joint trial that followed, Young was tried by the judge while Gulley was tried by a jury. Neither Young nor Gulley testified or presented any evidence on their own behalf.

Young was convicted on September 13, 1979 and sentenced on October 11, 1979 to

---

**1.** Within a week of Young and Gulley's joint trial on heroin possession with intent to deliver, the same trial judge had presided over a drug trial involving Gulley and affirmed a jury verdict finding Gulley guilty.

life imprisonment without possibility of parole. The trial court entertained Young's motion for a new trial on February 20, 1980. The predicate of Young's motion for a new trial was trial court error in (1) denying her pretrial motions; (2) denying a trial motion to disqualify the court; and (3) that the verdict was contrary to law. The court entered an order denying the motion for a new trial on March 3, 1980. Young substituted new appellate counsel at this juncture, attorney Tom Schey.

Sometime in February 1981, attorney Schey filed a motion in the Michigan Court of Appeals to remand for an evidentiary hearing on the ground that Young had not received effective assistance of counsel. On March 18, 1981, the Court of Appeals granted this motion.

On March 31, 1981, attorney Schey filed in trial court a motion for new trial on the grounds of ineffective assistance of counsel. In that motion, attorney Schey argued that (1) defense counsel Daltuva had filed untimely motions; (2) Daltuva had failed to make proper objections at trial; (3) Daltuva was substituted only a week before trial; (4) Young was never presented with the state's plea offer; and (5) Daltuva's conduct had rendered the trial a "sham" and "mockery of justice."

The trial judge conducted hearings styled "evidentiary" on June 11, June 18, and July 16, 1981. Attorney Schey did not call any witnesses. At the July 16 hearing, Schey informed the trial court that the alleged failure to inform Young of the plea offer was "spurious."[2] As to the rest of the claims, Schey told the trial court that he did not believe any testimony was needed. The trial court agreed and denied Young's second motion for a new trial.

Schey filed Young's brief on appeal of right as to the conviction to the Michigan Court of Appeals on January 11, 1982. The Court of Appeals affirmed her conviction and sentence on January 21, 1983.

On July 21, 1983, a new substituted appellate counsel, Charles J. Booker, filed a delayed application for leave to appeal in the Michigan Supreme Court. On May 17, 1985, the Michigan Supreme Court denied petitioner's application for leave to appeal as to the conviction and sentence.

On September 25, 1984, attorney Booker filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. That court dismissed the petition for lack of exhaustion of state remedies on March 10, 1985.

Represented by yet another appellate counsel (Douglass Mullkoff), petitioner Young returned to the state appellate courts, which denied her applications for delayed leave to appeal on June 24, 1984 (Michigan Court of Appeals) and December 17, 1986 (Michigan Supreme Court).

On January 9, 1986, attorney Mullkoff filed a second petition for a writ of habeas corpus raising the now exhausted six claims:[3] (1) denial of due process because Young's conviction was based on insufficient evidence; (2) denial of due process because of the trial court's failure to grant Young's motion to disqualify; (3) ineffective assistance of trial counsel in violation of the sixth amendment; (4) sentence imposed was cruel and unusual punishment under the eighth amendment; (5) denial of a fair trial and due process because of the joint trial; and (6) ineffective assistance of appellate counsel in violation of the sixth amendment. On December 16, 1987, the district court denied the petition.

Young is now represented by new appellate counsel, Martin A. Geer, in her appeal to this court. We deal only with the grounds for relief that Young asserts in this court.

## II.

### Ineffective Assistance of Counsel

Young's "primary thrust" on appeal is to get an evidentiary hearing on the issue of

---

**2.** It appears that Young received a five year sentence plea offer, which she declined. She also claimed that she did so because attorney Early told her that "no jury would convict [her]." Young does not rely on this alleged

advice as a separate basis for her claim of ineffective assistance.

**3.** Appellee concedes that Young has exhausted her remedies in state courts.

ineffective assistance of counsel. Petitioner's specific allegations of ineffective assistance are numerous: (1) substitute trial counsel had never tried a case before; (2) substitute trial counsel failed to request hearings on Young's pretrial motions to quash, sever, or suppress evidence, which motions had been made by attorney Early and had been denied by the trial court; (3) substitute trial counsel filed an untimely motion to disqualify the trial judge; (4) substitute trial counsel failed to object numerous times when she had grounds for objecting; (5) substitute trial counsel wrongly advised Young to waive a jury trial; and (6) appellate counsel Schey failed to call any witnesses at the three "evidentiary hearings" upon remand in state trial court on the ineffective assistance of counsel issue when an evidentiary hearing was required under Michigan case law.

The district court analyzed all of these various allegations of ineffective assistance under the standards set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland,* a habeas petitioner must first establish that counsel was "deficient" by showing that the counsel had committed errors so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. To evaluate a claim that counsel was deficient, the court must determine whether the "identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066. Second, the petitioner must also show that counsel's errors "prejudiced" the defense and "deprive[d] the defendant of a fair trial." *Id.* at 687, 104 S.Ct. at 2064. In proving prejudice, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. The district court in this case found that none of Young's allegations,

even if proven, would support a finding of "prejudice" under the second prong of the *Strickland* standard.

■ On appeal, Young attempts to sidestep the ineffective assistance issue on the merits by arguing that she never received an evidentiary hearing below and as a result the case should be remanded for such a hearing. As the Supreme Court held in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), a federal court must conduct an evidentiary hearing where the facts are in dispute "if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of trial or in a collateral proceeding." 372 U.S. at 312, 83 S.Ct. at 757.[4] At the state trial court level, Young was given the opportunity to call witnesses at three separate "evidentiary hearings." She asserts that appellate counsel Schey "inexplicably" failed to call witnesses at those hearings and as a result she never received a "full and fair" evidentiary hearing.

■ We do not agree. We seriously doubt that there are any genuine issues of material fact that would need to be resolved at an evidentiary hearing. Far from "inexplicable," we believe that the actions of appellate counsel Schey in not calling witnesses was a reasonable recognition that the allegations of ineffective assistance could be determined from the trial transcript alone. No additional evidence was really necessary for the trial court to make a fair determination of the sixth amendment issue. As such, we believe that Young received a "full and fair" hearing on the sixth amendment issue at the state court level. Moreover, we are not convinced that petitioner could produce any more evidence as to the "prejudicial" effect of the various allegations and consequently change the district court's result under the *Strickland* standard. As the brief recitation of facts above indicates, the evidence against Young was extremely strong. Po-

---

**4.** Title 28 U.S.C. § 2254 has codified the *Townsend* case by providing that a state court's determination of a factual issue shall be presumed to be correct unless "the factfinding procedure em-

ployed by the State court was not adequate to afford a full and fair hearing" or "the material facts were not adequately developed at the State court hearing." 28 U.S.C. § 2254(d)(2)–(3).

lice officers saw Young place two bags in the trunk, one of which was found to contain heroin. Further, a brown paper bag containing heroin was found on the front seat between Gulley and her. The bags together contained almost three pounds of heroin, an amount indicative of a large-scale drug operation. In addition, Young was driving the car in which the drugs were found. Even if all of the various pretrial motions had been timely raised and granted, we believe the result in this case would have been the same. Finally, Young's principal complaint about her trial attorney's performance is that the trial attorney recommended waiving a jury trial. Given the circumstances in this case, however, we believe this recommendation made a good deal of sense. Co-defendant Gulley had just been convicted by a jury on other drug-related charges the week before the trial. Since the case against Gulley was so strong, it would appear to be of some advantage to present her case to a trier of fact different from Gulley's, even though the trial judge had presided over Gulley's prior trial. While Young might prefer a new judge to try her case, she at least was assured of a trier of fact who would understand the obligation to consider her case separately from Gulley's. In support of her claim, Young submits affidavits from other attorneys, stating that the trial judge in question had a "pro-prosecutor" reputation and that no experienced attorney would recommend jury waiver before that particular judge. Additionally, there are other self-serving affidavits from Young's mother and co-defendant Gulley. We find all of these affidavits to be unavailing. In our view, the trial judge conducted the trial in a professional manner and impartially weighed the evidence before her. We therefore reject Young's request for a remand for an evidentiary hearing and affirm the district court's denial of relief on the ineffective assistance of counsel issue.

## III.

### Failure to Grant Severance

■ Young next asserts that the denial of her severance motion clearly prejudiced her right to a fair trial and therefore denied her due process because (1) she was denied the right to call co-defendant Gulley to the stand who could have provided exculpatory testimony; and (2) the co-defendants' defenses were antagonistic, both before and especially during trial.

We find no merit in these arguments. First, defendant did not raise in the court below her contention that she was deprived of the right to call her co-defendant as a witness. Indeed, the district court in considering this issue expressly stated that Young "does not claim a deprivation of a specific constitutional right as a result of her joint trial *such as the right to call witnesses* (*Byrd v. Wainwright,* 428 F.2d 1017 (5th Cir.1970)) or the right to confrontation (*Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968))." Joint Appendix at 184 (emphasis added). After reviewing the record, we can find no indication that Young has raised the issue of the right to call her co-defendant in connection with her severance motion. Consequently, we will only consider Young's argument that the severance motion should have been granted because of "antagonistic defenses" between Young and co-defendant Gulley.

The defenses were "antagonistic" in that, while neither defendant testified, counsel for each took the position that the other defendant solely possessed the heroin. As to that issue, we do not agree with Young that she was prejudiced in any way by the joint trial. This argument might have some merit if both defendants were tried by the same jury, and some confusion on the jury's part could be shown. *See United States v. Vinson,* 606 F.2d 149, 154 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980) ("Absent some indication that the antagonism between co-defendants misled or confused the jury, the mere fact that co-defendants attempt to blame each other does not compel severance."). As noted above, however, Young was tried by the trial judge in this case, while Gulley was tried by the jury. Young thus received the benefit of a different trier of fact as to her guilt. We

assume the trial judge impartially considered Young's case separately from Gulley's and did not convict Young solely on the basis of Gulley's acts or simply because Young happened to be with Gulley on that night. Nothing in the record contradicts this assumption. Moreover, as the district court noted, there is no reason to believe the evidence at a separate trial would have been any different, especially since the prosecution's theory was that the heroin possession was joint. Joint Appendix at 184. Consequently, we believe that the district court properly denied Young's petition as to the severance issue.

## IV.

### Cruel and Unusual Punishment

■ Young last raises an eighth amendment claim regarding the length of her sentence. Specifically, she asserts that the imposition of a mandatory, nonparolable life term to a first offender for possession of narcotics with intent to deliver, without regard to the circumstances of the offense, the previous record, or rehabilitative potential of the offender, constitutes cruel and unusual punishment under the eighth amendment. To support her claim, Young relies on the analysis contained in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), in which the Supreme Court declared unconstitutional a sentence of life imprisonment without parole. Young contends that the punishment—the most severe penalty imposed under Michigan law—is disproportionate to her crime.

At the outset, we note that an appellate court's review of a sentencing court's decision is characterized by substantial deference. *Solem*, 463 U.S. at 290, 103 S.Ct. at 3009. The Supreme Court, however, has not refrained from striking down a sentence as cruel and unusual in egregious noncapital cases. As noted above, the *Solem* Court declared unconstitutional a sentence of life imprisonment without parole. But as the Supreme Court observed in *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), "Outside the context of capital punishment, successful challenges to the proportionality of par-

ticular sentences have been exceedingly rare." Further, the Court has indicated that there must be a high degree of national consensus, as revealed through the actions of state legislatures and courts, before it will label a particular punishment cruel and unusual. *See Stanford v. Kentucky*, —— U.S. ——, ——, 109 S.Ct. 2969, 2977, 106 L.Ed.2d 306 (1989) (the Court stressed that *Solem* was a case where petitioner was "treated more severely than he would have been in any other State").

In the instant case, we must determine whether the sentence imposed constitutes one of those rare cases. We are guided in our analysis by two Supreme Court decisions considering eighth amendment challenges to life sentences. In *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), the Court upheld a life sentence with the possibility of parole imposed under the Texas habitual offender statute. The defendant in that case had committed three non-violent felonies: fraudulent use of a credit card to obtain $80 worth of goods and services; passing a forged check in the amount of $28.36; and "felony theft" for obtaining $120.75 by false pretenses. In denying relief to the defendant, the Court emphasized that the defendant was eligible for parole under Texas law after 12 years.

Three years later, the Supreme Court, in *Solem*, revisited the issue. The *Solem* Court held that a life sentence without parole imposed after seven felony convictions was unconstitutional. The seven felonies included violent as well as nonviolent felonies: three convictions for third-degree burglary; obtaining money by false pretenses; grand larceny; third-offense driving while intoxicated; and uttering a "no account" check for $100. In reaching its result, the Court set out three objective factors that should guide a court's proportionality analysis under the eighth amendment. These factors are: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same offense in other jurisdictions.

463 U.S. at 290–92, 103 S.Ct. at 3009–11. Utilizing these factors, the *Solem* Court found that the life sentence imposed in that case was disproportionate to the crimes committed. In its proportionality analysis, the Court particularly stressed that the petitioner was "treated more severely than he would have been in any other State" and had received "the penultimate sentence for relatively minor criminal conduct." *Id.* at 300–03, 103 S.Ct. at 3014–17. The criminal act that actually brought about the penalty, the last felony, was uttering a "no account" check for $100.

Not every case, however, requires an extended proportionality analysis. Significantly, the *Solem* Court made it very clear that it was not overturning its earlier decision in *Rummel,* in which the Court rejected the use of proportionality analysis. The *Solem* Court emphasized that the possibility of parole in *Rummel* distinguished it from *Solem.* 463 U.S. at 303 n. 32, 103 S.Ct. at 3017 n. 32.[5] Not surprisingly, lower courts, including this circuit, have placed great emphasis on the possibility of parole in determining the level of review required under the eighth amendment. *See United States v. McCann,* 835 F.2d 1184 (6th Cir. 1987), *cert. denied,* — U.S. ——, 108 S.Ct. 2004, 100 L.Ed.2d 234 (1988) (life imprisonment without parole for several federal drug-related charges; extended proportionality analysis revealed that sentence not excessive considering the nature of the violations); *Chandler v. Jones,* 813 F.2d 773 (6th Cir.1987) (life sentence with possibility of parole imposed under the Tennessee Habitual Criminals Act upon conviction of third-degree burglary; case factually similar to *Rummel* and consequently no proportionality analysis needed). As this case involves the imposition of a life sentence without parole upon a first offender, we believe an extended proportionality analysis is warranted.

We begin our *Solem* analysis with the first and primary factor—the gravity of the offense and the harshness of the penalty. Petitioner Young was convicted of possession with intent to deliver 650 grams or more of heroin. We have little doubt that her crime is one of the gravest a person can commit today. Young possessed with intent to distribute approximately 1300 grams of heroin (almost twice the amount upon which the penalty could be predicated), an extremely addictive narcotic. The ripple effect on society of such a large quantity of heroin is staggering to contemplate. Indeed, as one court has aptly observed: "Except in rare cases, the murderer's red hand falls on one victim only, however grim the blow; but the foul hand of the drug dealer blights life after life and, like the vampire of fable, creates others in its owner's evil image—others who create others still, across our land and down our generations, sparing not even the unborn." *Terrebonne v. Butler,* 848 F.2d 500, 504 (5th Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989). We thus consider the crime that Young committed to be very serious.

Without question, Young received an extremely harsh sentence. She will spend the rest of her life in prison with no possibility of returning to society. At the time of her conviction, Young was twenty-five years old and the mother of a small child. She has already served almost ten years of her life sentence. Furthermore, from all indications, co-defendant Gulley, not Young, was the major target of the Detroit police investigation. According to newspaper articles, Gulley allegedly operated an $8–million–a–month drug empire, using his car wash as a cover for his extensive narcotics business. Nothing in the record indi-

---

**5.** As the Court noted: "Contrary to the suggestion in the dissent, ... our conclusion today is not inconsistent with *Rummel v. Estelle.* The *Rummel* Court recognized—as does the dissent ...—that some sentences of imprisonment are so disproportionate that they violate the Eighth Amendment. (citation omitted).... *Rummel* did reject a proportionality challenge to a particular sentence. But since the *Rummel* Court— like the dissent today—offered no standards for determining when an Eighth Amendment violation has occurred, it is controlling only in a similar factual situation. *Here the facts are clearly distinguishable. Whereas Rummel was eligible for a reasonably early parole, Helm, at age 36, was sentenced to life with no possibility of parole.* (citation omitted)." 463 U.S. at 303 n. 32, 103 S.Ct. at 3017 n. 32 (emphasis added).

cates that Young was a partner in Gulley's drug business other than on this particular occasion. Nor did anything in her criminal record indicate a propensity for crime, as this was her first offense. Additionally, she has received drug counseling since her arrival at prison, an indication that Young may have had an underlying drug problem herself. Considering her background, one has to conclude that a life sentence without even the possibility of parole borders on overkill. Thus, under the first factor, we have a very serious crime punished by an extremely harsh penalty.

The second factor requires us to consider how the sentence for this crime compares to sentences imposed for other crimes in the same jurisdiction. Large-scale drug traffickers (defined by the Michigan legislature as those persons possessing 650 grams of Level I narcotics or more) are treated the same as first-degree murderers (Mich.Comp. Laws § 750.316). Both receive mandatory life imprisonment without parole, without regard to the criminal record or rehabilitative potential of the offender. The Michigan Penal Code also provides for a mandatory life sentence with possibility of parole for treason (§ 750.544). It authorizes discretionary life sentences with possibility of parole for various other crimes such as second-degree murder (§ 750.317), attempted murder (§ 750.91), causing death by explosives (§ 750.327), armed robbery (§ 750.529), first-degree criminal sexual conduct (§ 750.520b(2)), and kidnapping (§ 750.349). In its sentencing scheme, the Michigan legislature has recognized the devastating consequences of large-scale drug trafficking by treating that crime as being more serious than many of the violent crimes. It has chosen to take the drug problem in its state "by the horns" by going after the major sources of illegal drugs. By imposing such a harsh penalty, it obviously hopes to provide a strong deterrent to those who would deal illegal drugs and possibly prevent some of the violent crimes often associated with drug trafficking. While one might question the trial court's lack of discretion in the sentencing process, we certainly do not believe that the punishment imposed for large-scale drug traffickers is in all cases inappropriate.

Finally, we must compare this sentence to sentences imposed on defendants convicted of the same crime in other jurisdictions. With the exception of Louisiana, Michigan seems to impose the most severe penalty for a first offender convicted of possession with intent to deliver large quantities of a controlled substance. The mandatory life sentence without parole is significantly more severe than that permitted by other states in the Sixth Circuit. Kentucky: Ky.Rev.Stat.Ann. § 218A.990(1) (Baldwin 1981) (5 to 10 years for first offense; $5,000–$10,000 fine; eligible for parole); Ohio: Ohio Rev.Code Ann. § 2925.03(A)(6) (Anderson 1987) (aggravated trafficking—actual incarceration of 3 years if no prior offense; no parole for three years); Tennessee: Tenn.Code Ann. § 39–6–417(c)(1) (Supp.1988) (10 years to life; fine not more than $200,000; eligible for parole). Even comparing Michigan to states experiencing, according to the news media, similar drug problems, Michigan's penalty generally is more severe. *See, e.g.*, California: Cal. Health & Safety Code §§ 11351, 11352.5(1), 11370.2, 11370.4 (West Supp.1989) (2, 3, or 4 years; $50,000 possible fine for sale of heroin; if amount of heroin over 3 pounds but under 10 pounds, an additional 3 years; if prior conviction, possible enhancement); Florida: Fla.Stat.Ann. § 893.135(1)(c)(3) (West Supp. 1989) (mandatory minimum term of 25 years; $500,000 fine; no parole); Louisiana: La.Rev.Stat.Ann. § 40.966 (West 1986) (possession with intent to distribute heroin—mandatory life imprisonment at hard labor; no parole); New York: N.Y. Penal Law §§ 70.00, 220.21 (McKinney 1980 & Supp.1987) (class A–I felony; maximum term of life; minimum term of 15 to 25 years; eligible for parole); Texas: Tex.Rev.Civ.Stat.Ann. art. 4476–15, § 4.03(d)(3) (Vernon Supp.1988) (400 grams or more of heroin—life or 15 to 99 years; fine not to exceed $250,000; felony of the first degree—aggravated offense; eligible for parole). Moreover, had this case been prosecuted under federal law, Young would

have received a significantly lighter sentence, even under the "toughened" sentencing guidelines. *See* United States Sentencing Commission Guidelines § 2D1.1(a)(3) (October 1987) (possession of 1–2.9 kilograms of heroin constitutes a Level 32 offense out of a possible Level 43; with no criminal background, sentence would be 121 to 151 months or approximately 10–13 years; this amount can be adjusted upward if the heroin is unusually pure; no parole).[6] Nonetheless, even assuming Michigan has the toughest drug law of all the states, the question, as we see it, is whether the Michigan statutory scheme is totally out of line with these other states. Clearly, most of the states listed above prescribe heavy penalties for drug trafficking, albeit with much more consideration for the criminal background and possibility of rehabilitation of the offender. In many of these states, the sentencing judge has the discretion to impose a life sentence or a significant term of years for drug traffickers. Additionally, given the present political climate, it may well be that many of these states will change their penal codes to provide for even stiffer sentences for drug offenders in the future. Thus, notwithstanding its harshness, we believe Michigan's drug law is in the range of the drug laws of other states.

Having analyzed Young's sentence under each of the *Solem* factors, we conclude that her sentence is not so grossly disproportionate to her crime as to violate the eighth amendment. In reaching this conclusion, we are persuaded by the Fifth Circuit's recent decision in *Terrebonne v. Butler*, 848 F.2d 500 (5th Cir.1988) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989), in which that court upheld against similar eighth amendment challenges a mandatory life sentence without parole for a heroin offender. The *Terrebonne* case involved a 21–year old heroin addict who was convicted of delivering 22 individual doses ("packets") of heroin to undercover police officers. Terrebonne

had a prior record of a felony and misdemeanor, each conviction stemming in part from his serious drug addiction. Under Louisiana law, he received a mandatory life sentence without parole. Two panels and two en banc decisions later, the Fifth Circuit upheld his sentence as not being grossly disproportionate to his crime. *See* 624 F.2d 1363 (5th Cir.1980) (remanded for resentencing); 646 F.2d 997 (5th Cir.1981) (initial en banc) (sentence not cruel and unusual, especially considering Terrebonne's criminal record); 820 F.2d 156 (5th Cir.1987) (on panel reconsideration after *Solem*, proportionality analysis revealed sentence not cruel and unusual); 848 F.2d 500 (5th Cir.1988) (second en banc) (under *Solem*, sentence not disproportionate to the crime). In affirming Terrebonne's sentence, the majority recognized its apparent harshness by commenting that the "tiger trap had sprung upon a sick kitten." 848 F.2d at 505. Nonetheless, the majority refused to interfere with Louisiana's attempts to bring its serious illegal drug problem under control.

In this case, we similarly believe that the tiger trap may have sprung upon a sick kitten. We are not at all convinced that petitioner Young is the type of "kingpin" drug dealer which the Michigan legislature has properly targeted for its harshest punishment. Gulley, with his alleged drug empire and other drug convictions, seems to have been much more deserving of a mandatory life sentence without parole. Yet the facts remain clear. Young was involved with Gulley on the night of the crime in the possession with intent to distribute a large quantity of heroin. And indisputably, heroin dealing in any quantity is a very serious offense. Considering the severity of the crime, we refuse to interfere with Michigan's efforts to punish major drug traffickers to the fullest extent of the law, even those who are first offenders. In finding no eighth amendment violation as a matter of federal law, we do not decide whether this punishment is "cruel

---

**6.** The Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, 102 Stat. 4181, 4371, amending 21 U.S.C. § 841(b)(1)(A), provides for a mandatory life sentence without release for third-time drug offenders.

and unusual" as a matter of Michigan law.[7] Moreover, we do not intend in any way to comment on Young's ultimate eligibility for executive clemency by the governor of Michigan.

Accordingly, we deny petitioner's three contentions on appeal and affirm the district court's decision denying this habeas corpus petition.

---

**7.** At this date, the Michigan Supreme Court has not decided this issue. The Michigan Court of Appeals, however, has held that a mandatory life sentence without parole for possession of 650 grams or more of cocaine is not cruel and unusual punishment under the Michigan constitution. *People v. Harding,* 163 Mich.App. 298, 413 N.W.2d 777, 791 (Mich.App.1987), *vacated on other grounds,* 430 Mich. 859, 420 N.W.2d 826 (Mich.1988). Nonetheless, this issue continues to generate litigation. For instance, in *People v. Ryan,* No. 113462 (Mich.Ct.App. filed Jan. 14, 1989) (CR–87–82806–FH, Oakland County Circuit Court), a Michigan trial court has recently held that a mandatory life sentence without parole violates the Michigan constitution. The facts in that case are virtually identical to the instant case, in that Ryan was a first offender convicted of possessing and delivering more than 650 grams of cocaine. The trial court refused to impose a mandatory life sentence and instead imposed a sentence of seven to thirty years. That case has been appealed and is presently before the Michigan Court of Appeals.