**UNITED STATES of America**

v.

**Vernon HOLLAND.**

**UNITED STATES of America**

v.

**Lamar HARRIS.**

**Crim. Nos. 89–0342–01(HHG), 89–0036–02(HHG).**

United States District Court, District of Columbia.

Jan. 11, 1990.

126

Patrice I. Kopistansky, Thomas E. Zeno, Asst. U.S. Attys., Washington, D.C., for U.S.

Thomas Abbenante, Washington, D.C., for Vernon Holland.

## OPINION

HAROLD H. GREENE, District Judge.

The two cases before the Court present ramifications of this Court's earlier decision in *United States v. Roberts*, 726 F.Supp. 1359 (D.D.C.1989), which held unconstitutional on due process grounds, particularly as applied in this District, the new federal sentencing statute,[1] and the guidelines issued pursuant thereto by the Sentencing Commission.

### I

On November 16, 1989, in a comprehensive Opinion, the Court stated in *Roberts* that in its view the sentencing statute is unconstitutional under the Fifth Amendment's Due Process Clause, and that recent policies of the United States Attorney for this District regarding the transfer of cases from the District of Columbia Superior Court to this Court "skewed the process even further." This was so, according to *Roberts*, because the prosecutor had *inter*

---

1. Sentencing Reform Act of 1984, Pub.L. No. 98–473, 98 Stat.1987 (codified as amended at 18 U.S.C. §§ 3551–3559, 3561–3566, 3571–3574, 3581–3586 (Supp. IV 1986) and 28 U.S.C. §§ 991–998 (Supp. IV 1986)).

*alia* transferred[2] to this Court from the local tribunal the cases of defendants who had refused to plead guilty, and those against whom charges had been dismissed or were subject to dismissal on account of the failure of the prosecution to be ready for trial on the date or dates set by the Superior Court. Based upon these considerations, the Court dismissed the charges against two defendants in cases pending before it,[3] and it set down for a hearing the motion to dismiss of a third, Vernon Holland.

On November 27, 1989, the government filed an opposition to Holland's motion in which it argued that the Court had no jurisdiction to interfere with the exercise of the U.S. Attorney's prosecutorial authority. Attached to the opposition was a factual declaration of Assistant U.S. Attorney Charles J. Harkins, Jr., who directed the transfer operation, providing details of the transfer of approximately fifty-five cases from D.C. Superior Court to this Court.[4] The opposition and the Harkins declaration contend in essence that the transfer operation did not have the purpose to confer tactical litigation advantages on the prosecution or to impose corresponding burdens on Holland or any other defendant.

Counsel for the defendant subpoenaed Mr. Harkins and three other Assistant U.S. Attorneys who were involved in the Holland transfer decision, as well as the files on the other individuals whose cases had been moved from Superior Court to this Court.[5] A hearing was held on January 4–5, 1990, on the conflicting claims regarding the purpose and effect of the transfers of the cases originally indicted in D.C. Superior Court.

## II

At the hearing on the motion to dismiss, Mr. Harkins described the procedure by which indictments were obtained in this Court for individuals already indicted in Superior Court for similar or identical offenses. Mr. Harkins testified that five specific criteria were used for the transfer decisions: the gravity of the offense, the defendant's prior record for drug crimes, prior record for violent crimes, the use of weapons, and the amount of the drugs. According to Harkins, the Assistant U.S. Attorneys assigned to felony trials in Superior Court[6] were asked to list those who met these criteria.[7] However, it soon became apparent that this system was not workable, and the Harkins task force accordingly made a direct search of the files of approximately two hundred defendants[8]

---

2. "Transfer" as used herein, refers to the practice of securing an indictment in this Court when an indictment was already pending in D.C. Superior Court against the same defendant for the same conduct.

3. *United States v. Wonson*, Cr. No. 89–0319; *United States v. Mills*, Cr. No. 89–0342.

4. The Harkins declaration is attached hereto as an Appendix.

5. The Court denied the government's motion to quash the subpoena, holding that by the Harkins declaration the prosecution had placed the bona fides of the transfer decisions in issue, and that defendant was for that reason entitled to the underlying papers with which to challenge those bona fides if he could do so. However, the Court granted the motion to quash with respect to documents in the files which would expose prosecution strategy or the names of possible trial witnesses. The Court subsequently also denied a subpoena for Jay Stephens, the United States Attorney for this District.

6. There are some fifteen such prosecutors.

7. Some of the prosecuting attorneys used other or additional criteria (or Harkins failed to list all of them). Thus, Assistant U.S. Attorney Sharon Sprague noted proximity of the drug sales to schools as constituting one criterion—a subject not mentioned by Mr. Harkins. It should be noted that under federal law this factor would lead to a doubling of the punishment in this Court, and its employment therefore added to the pressure on the defendant to plead guilty in Superior Court and thereby avoid a transfer. *See infra.*

8. Mr. Harkins stated that it was impossible to determine how many of the remaining thousands of defendants displayed characteristics identical to those whose cases were transferred to this Court, but he candidly conceded that there were some or perhaps many. As discussed below, there is a substantial disparity between the sentences required to be imposed in this Court under the mandatory minimum sentencing laws and the Sentencing Commission guidelines, on the one hand, and the sentences which may be and are imposed in Superior Court, on the other. In view of that dispari-

out of the five thousand or more whose cases were pending in Superior Court on drug charges. Ultimately, two groups of cases were transferred by this method, the first consisting of forty cases, the second of fifteen cases. However, individual transfers continued to be made thereafter and are still being effected now.

Mr. Harkins, supported to an extent by the other three prosecutors who testified, stated emphatically and in accordance with his original declaration, that neither the failure of a defendant to plead guilty nor the dismissal or threatened dismissal of charges in Superior Court for failure of the prosecution to be ready for trial played any part in the transfer decisions. The defendant produced no testimony from any Assistant U.S. Attorney to contradict these assertions. However, he did produce some twenty-nine files out of the fifty-five [9] of the transfer cases which demonstrate that the prosecution almost invariably secured a tactical litigation advantage as a consequence of the transfers.

In case after case, the particular defendant whose case was transferred had declined to plead guilty in Superior Court [10] prior to his indictment in this Court.[11] Indeed, in several instances, the relationship between the refusal to enter a guilty plea and indictment in federal court was explicitly spelled out.[12]

Similarly, in case after case, the U.S. Attorney's Office secured an indictment in this Court shortly before, contemporaneously with, or shortly after, a trial date in Superior Court. In several instances, the prosecution either was not, or expected not to be, ready for trial in the local court on the date set, but asked for a continuance ostensibly to enable it to become ready.[13] Nevertheless, the U.S. Attorney's Office then secured an indictment in this Court prior to the next Superior Court trial date,[14] or obtained such an indictment upon

ty, the practical consequences to a defendant from a transfer, or failure to transfer, whether accidentally or by design, are enormous.

To put it in more concrete terms, there must be at least fifty-five defendants whose cases remain pending in Superior Court which are mirror images of the fifty-five cases which were transferred here by the makeshift process used for the transfers. Those defendants who happened not to have been picked up for indictment here can confidently look forward to sentences of probation or imprisonment for short periods, while their counterparts who are now in this Court, will receive sentences of imprisonment for many years.

The issue is not which sentencing structure is preferable as a matter of policy; that is obviously for the Congress to decide. The issue is whether the enormous power of the U.S. Attorney's Office in this District (*see* pp. 130–131, *infra* ) is being exercised prudently and in accordance with the principles of due process and equal protection.

9. It is a credit to his enterprise and ingenuity that Mr. Thomas Abbenante, counsel for the defendant, a single practitioner specializing in the defense of individuals accused of crimes here and in Superior Court, was able on short notice to undertake and complete a detailed survey and analysis of even that many prosecutorial files.

10. Not infrequently, a co-defendant did plead guilty there.

11. Among the cases in this category are *United States v. Holland,* Cr. No. 89–0342–01; *United*

States v. Mills, Cr. No. 89–0342–02; *United States v. Saunders,* Cr. No. 89–0402; *United States v. Williams,* Cr. No. 89–0364; *United States v. Bailey,* Cr. No. 89–0310; *United States v. Ball,* Cr. No. 89–0253; *United States v. Peace,* Cr. No. 89–0365; *United States v. Roscoe Bracey,* Cr. No. 89–0376–01; *United States v. Phillip Bracey,* Cr. No. 89–0376–02; *United States v. Ricketts,* Cr. No. 89–0361 (plea offer outstanding until indicted in District Court); *United States v. Taylor,* Cr. No. 89–0358; *United States v. Lee,* Cr. No. 89–0299; and *United States v. Warren,* Cr. No. 89–0379.

12. *See United States v. Shawn Sims,* where the prosecutor noted that he had "told the defense counsel that if the drugs here meet the federal mandatory minimum of five grams or more of crack, the defendant must plead immediately or the case will be transferred to District Court." Tr. of January 4, 1990 hearing at 86. *See also, United States v. Williams,* Cr. No. 89–0364 ("defendant did not plead until faced with the District Court indictment") Tr. of January 4, 1990 at 37.

13. At times necessary witnesses or documents were missing or unavailable when the case was originally called for trial on the Superior Court calendar in accordance with a continuance date set long in advance.

14. *United States v. Saunders,* Cr. No. 89–0402; *United States v. Carter,* Cr. Nc. 89–0359; *United States v. Ricketts,* Cr. No. 89–0361; *United States v. Constley,* Cr. No. 89–0298; *United States v.*

a Superior Court dismissal for want of prosecution.[15]

■ The Court finds that the circumstantial evidence of what actually occurred is more persuasive than the necessarily self-serving declarations of those who conducted the operation. It is improbable that the relationship in time between the transfer decisions, on the one hand, and the trial dates in Superior Court, on the other, was entirely coincidental.

It is not necessary, however, to decide this motion primarily on the basis of a conflict between the testimony of the no doubt well-meaning Assistant U.S. Attorneys and the facts as they emerge from the documents. Although Mr. Harkins denied repeatedly that transfer decisions were made to coerce guilty pleas in Superior Court,[16] his testimony regarding avoidance of Superior Court trial dates was more equivocal. While the witness testified that he was not personally influenced by the imminence of Superior Court trial dates, or the possibility of dismissals for want of prosecution by that court, he did acknowledge that the factual data demonstrating these possibilities, probabilities, or certainties were usually listed on the file jackets which he and others reviewed. Furthermore, although the witness initially stated that his transfer decisions were made long before these Superior Court trial events became imminent threats, he subsequently conceded that decisions were made over a long period of time, and that some of them are still being made now.

The short of the matter is this. Properly analyzed, the documents and the testimony of the prosecutors are not in substantial disagreement on two fundamental matters —that, whatever the purpose,[17] the defendants were, in fact, disadvantaged by the methods by which the transfer operations were carried out,[18] and that the effect of the transfers was to secure for the prosecution significant tactical litigation advantages.[19]

In the typical case, a decision was made in May or June of 1989 to secure an indictment in this Court, even though an indictment for the same conduct was already outstanding in Superior Court. However, despite the fact that the decision to transfer had already been made, the new federal indictment was deliberately not obtained until the fall of that year, just about the time the Superior Court case was called for trial and could no longer be postponed. During the interim period (between four and six months) normally no one other than the prosecutor knew—not the judge, not the defense counsel, not the defendant— that the proceedings in Superior Court

---

Lee, Cr. No. 89–0299; *United States v. Goggins,* Cr. No. 89–0366; *United States v. Williams,* Cr. No. 89–0364; *United States v. Roscoe Bracey,* Cr. No. 89–0376–01; *United States v. Phillip Bracey,* Cr. No. 89–0376–02; *United States v. Horne,* Cr. No. 89–0372–01; *United States v. Barnes,* Cr. No. 89–0372–02; *United States v. Hill,* Cr. No. 89–0282–01; *United States v. McCarthy,* Cr. No. 89–0282–02; *see also, United States v. Wiggins,* Cr. No. 89–0301 (Superior Court denied continuance). In a few other instances, the trials were postponed apparently for other reasons, but again District Court indictments were obtained during the interim period.

**15.** *United States v. Williams,* Cr. No. 89–0364; *United States v. Ball,* Cr. No. 89–0253; *United States v. Jones,* Cr. No. 89–0356.

**16.** Moreover, under *Bordenkircher v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978), it is not illegal for a prosecutor to charge a defendant with a more serious offense in the wake of that defendant's failure to plead guilty. It should be noted, however, that the *Bordenkirch-*

er rule has never been applied in the context of a legal situation where, as here, the prosecutor is able not only to select the more serious charge but also the sentence that must be imposed on the new charge. *See United States v. Roberts, supra,* 726 F.Supp. at 1363–1365. At the time *Bordenkircher* and *United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), were decided, the judge was able by his sentencing decisions to eliminate or to mitigate the consequences of prosecutorial overreaching resulting from an increase in the charge in the wake of a refusal to plead guilty. As indicated, that safety valve is largely gone.

**17.** The prosecutors do, of course, vehemently deny any improper purpose.

**18.** This is entirely apart from the disadvantage of being tried under a more severe sentencing scheme.

**19.** These widespread effects are circumstantial evidence of purpose.

were entirely meaningless since they would inevitably be superseded by new proceedings in District Court. This Court rejects the prosecution's claim that this relative imbalance in knowledge did not amount to a tactical litigation advantage or that the prosecution had not generated it by its actions.

As far as the defendants and their counsel are concerned, they were spending their time, energy, and money in attempting to interview witnesses, track down leads, perform legal research, to file motions, and make court appearances, all against phantom charges—charges that the prosecution had no intention of bringing to fruition.[20] Indeed, it appears that even the Superior Court judges were misled in some of the cases: they were requested to grant to the prosecution a continuance of the trial on the basis that, on the continued date, unlike at the time of the request, the prosecution would be ready to go forward, when actually the government had no intention of proceeding to trial in that court, having already secured or being about to secure an alternative indictment in this Court.

Moreover, there is an injury to the defendants that is even more direct—a violation of their right to a speedy trial. If an indictment had been returned when the decision was made to proceed in this Court in lieu of the pending Superior Court prosecution, the government would have had seventy days in which to proceed to trial. 18 U.S.C. § 3161. By deliberately waiting several months (typically some 120 to 180 days) following the decision to transfer but prior to its implementation, the prosecution doubled or tripled that seventy-day period, and to that extent it intentionally deprived the defendant of his speedy trial rights.[21]

The prosecution's own explanation for the delay substantiates that conclusion. Mr. Harkins testified that the decision was made to space the return of the federal court indictments over a substantial period both to avoid unduly burdening the District Court system and to avoid triggering the Speedy Trial Act clock. At the hearing, Harkins explained how avoidance of the Speedy Trial Act factored into the transfer decision:

> Witness: I told them [the assistants] that in returning their indictments that they were to return them based upon the trial dates that were set in Superior Court, and I did not want all 30 indictments returned in one massive return.
>
> Government Counsel: Why is that?
>
> Witness: Because it would have bogged down—under the Speedy Trial Act in the District of Columbia, it would have made trying those cases virtually impossible for both the Court and the individual assistants who were assigned to try them, because they would all have come up within the same 30 to 60 day period of time to be set for trial.

Transcript of January 5, 1990, Volume II, p. 51.

Such manipulation of the overlapping jurisdiction of the U.S. Attorney's Office with the purpose to avoid the strict requirements of the Speedy Trial Act is "antithetical to the goals of the Federal speedy trial legislation." *See* H.R. No. 93–1508, 93rd Cong., 2d Sess. 40, reprinted in 1974 U.S.Code Cong. and Adm.News, 7401, 7441.[22]

### III

Equally important, if not more so, is the context in which all of these activities took place. As the Court explained in *Roberts,*

---

**20.** Some of these efforts will presumably be useful also in the proceedings to be held in this Court on the new indictments; but obviously not all of them. Certainly, the emotional energy of a defendant, particularly one who is intent on going to trial, and who diligently prepares for it for weeks or months only to have to start anew when a new indictment is obtained in another tribunal, will be dissipated beyond the possibility of recapture.

**21.** The Speedy Trial Act does not apply to the Superior Court.

**22.** As the Court noted in *Roberts, supra,* 726 F.Supp. at 1371–1372, the decision of the Court of Appeals in *United States v. Robertson,* 810 F.2d 254 (D.C.Cir.1987), does not stand as a bar to dismissals on Speedy Trial Act grounds where there is evidence that the prosecution has intentionally evaded the Act, with the effect of the achievement of a tactical advantage.

the transfer of a criminal case from a District of Columbia court to this federal court now has implications and consequences that were absent before the new federal sentencing law and the Sentencing Commission guidelines were promulgated. Under these guidelines, "the prosecutor's selection of the charges available to him from his large arsenal [in federal court] amounts at the same time to an almost precise selection of the ultimate sentence" to be imposed upon the defendant. *Roberts*, 726 F.Supp. at 1365. It follows that, when the government decides on a transfer of a defendant's case from the District of Columbia court to this Court, he exposes the accused not only to a prosecution in a different court and a different judicial system, but also to a sentence the prosecutor can and frequently does calibrate in advance. In fact, in one of the examples before the Court on the present motion, the Assistant U.S. Attorney in Superior Court calculated with precision the sentence that would have to be imposed on the defendant upon his indictment in District Court.[23]

When to the power effectively. to determine the sentence that is vested in federal prosecutors everywhere by the sentencing law and the guidelines is added the unique power entrusted to the U.S. Attorney for this District to prosecute both in the federal and in the local courts—an authority not matched by any prosecutor, federal or state, anywhere in the United States—an accumulation of prosecutorial authority exists that is probably unprecedented in the American system of justice. That being the case, one might legitimately expect that these vast powers will be exercised with

particular circumspection and restraint and with special regard for fairness to those affected by the decisions. On this record, the Court cannot find that that is what is occurring. The decisions made sought to maximize advantages to the prosecution irrespective of any other considerations.

The prosecution defends these choices on the basis that such measures are necessary to combat the drug problem that constitutes an extraordinary menace to this city and this nation. There is no question but that the illegal drug traffic presents a direct and massive threat to national domestic tranquility and to the safety of individual citizens. It is also beyond dispute that energetic actions are in order to fight and defeat this menace, and this Court has so stated on many occasions. *See, e.g.,* p. 133, *infra.*

However, the measures adopted by the prosecution in these cases are not only ill-suited to that end, for they reach by and large only relatively marginal cases, not those of truly major offenders,[24] but, more importantly, shortcuts in constitutional compliance cannot be justified on any basis. Whenever in history such shortcuts were initially countenanced on account of what were regarded as emergency situations, the courts and the American people have ultimately come to regret them.[25]

## IV

The prosecution has chosen the instant case as a vehicle for a broad effort to undo the underpinnings of part of the Court's decision in *Roberts.* For that reason, the Court has allowed evidence and arguments

**23.** According to that prosecutor, his "calculations under the Guidelines [in the case of *United States v. Bailey,* Cr. No. 89–0310] come out to 37 to 46 months, plus 5 years mandatory minimum consecutive." Tr. of January 4, 1990 hearing at 50.

**24.** The typical case transferred from Superior Court to this Court involves relatively small quantities of narcotics, and the defendants, while they may have prior criminal records, do not appear to be career criminals. If proof of these propositions were needed, it is supplied by the fact that these cases were not indicted in this Court in the first place, and that they were culled out of the mass of narcotics prosecutions

pending in Superior Court only by means of a laborious process which encountered considerable difficulty distinguishing between cases that on their face or otherwise met transfer guidelines and others that did not. *See also,* note 8, *supra.*

**25.** *See, e.g., Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (Japanese relocation cases); *Debs v. United States,* 249 U.S. 211, 39 S.Ct. 252, 63 L.Ed. 566 (1919) (upholding conviction of presidential candidate for speech opposing United States participation in World War I).

to be adduced on the entire subject of the recent case transfers from Superior Court. Upon consideration of that evidence and those arguments, the Court finds that the transfers have had the effect in a substantial proportion of the cases of violating the defendants' due process and speedy trial rights, and it hereby reaffirms the conclusions reached in the *Roberts* case.

As for the defendant Vernon Holland, he was treated much like many of the other transferees. He was arrested on February 16, 1989, for possession with intent to distribute cocaine,[26] and two days later he was presented in Superior Court. On May 18, 1989, counsel for Holland's co-defendant Mills filed a motion to suppress, based upon an allegedly illegal no-knock entry, and Holland subsequently joined in that motion. Apparently because of the no-knock problem, the defendants were offered guilty pleas to the offense of attempted possession with intent to distribute cocaine,[27] but because of their strong expectation of prevailing on the motion[28] the defendants rejected the offer. The case was accordingly set for trial for October 5, 1989. However, on that date it was continued to October 17, 1989[29] when the Superior Court granted the government's motion to dismiss the charges.

In any event, several weeks earlier, on September 21, 1989, the prosecution had already secured indictments against these defendants in this Court for possession with intent to distribute more than 5 grams of crack. That offense carries a mandatory five-year minimum penalty and a maximum penalty of forty years—far higher than the punishment for the offense for which defendants were indicted in Superior Court[30] and even more so than that to which they had been offered pleas by the prosecution before the suppression issue arose.[31]

It is the Court's conclusion that, like a number of the other defendants, Holland has been deprived of his rights under the Due Process Clause and under the Speedy Trial Act, and the charges against him will therefore be dismissed.

## V

Lamar Harris was convicted of two conspiracy counts, use of juveniles in drug trafficking, six counts of unlawful use of a firearm in aid of drug trafficking, four counts of distribution of cocaine, one count of assault with a dangerous weapon, and one count of unlawful possession of a firearm, and on October 18, 1989, this Court sentenced him pursuant to the federal sentencing statute and the Sentencing Commission guidelines to imprisonment for life plus fifty-five years. Thereafter, defendant moved to preclude application of the guidelines[32] on the basis that these guidelines violate the Due Process Clause of the Constitution and constitute cruel and unusual punishment in violation of the Eighth Amendment.

---

26. The penalty for that offense under local law is imprisonment for a minimum of 20 months and a maximum of 5 years.

27. The penalty for that offense has no mandatory minimum.

28. Tr. of October 5, 1989 at 6. It was claimed that a government witness testified at a preliminary hearing that entry was made as soon as the police arrived, there was no announcement of their presence, and no exigent circumstances.

29. On October 5, 1989, the prosecutor had raised the stakes, apparently because of defendants' insistence on the suppression motion, stating that the government would thereafter accept pleas only to the original indictment. Defendants rejected the offer. The Superior Court judge thereupon continued the matter to October 17, 1989. On that date he decided that the defendants should challenge the legality of their transfer in District Court instead, and he dismissed the charges.

30. *See* note 26, *supra*.

31. *See* note 27, *supra*.

32. On October 17, 1989, the day before sentencing, counsel for Harris filed a motion to preclude application of the sentencing guidelines based on an argument that the Sentencing Act and its guidelines violate the Due Process Clause of the Constitution. The Court denied the motion at that time without prejudice to its renewal later. The motion now before the Court is therefore technically a motion for reconsideration of that denial.

■ There is no merit to the Eighth Amendment challenge. In *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Supreme Court established a three-part test for determining whether a particular sentence of imprisonment passes the proportionality analysis required under *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), and *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). The part of the test here relevant is that which requires a court to consider "the gravity of the offense and the harshness of the penalty." *Solem*, 463 U.S. at 292, 103 S.Ct. at 3011.

At least two Circuits have recently upheld sentences of life imprisonment for drug offenders in application of this standard. *Young v. Miller*, 883 F.2d 1276, 1283 (6th Cir.1989); *Terrebonne v. Butler*, 848 F.2d 500, 504 (5th Cir.1988) (en banc), both stating that the distribution of drugs in large quantities is very serious in that, while a murderer kills only a single victim, "the foul hand of the drug dealer blights life after life and like the vampire of fable, creates others in its own evil image...." While the Court of Appeals for this Circuit has not yet had occasion to express itself on this subject, this Court has no hesitancy in associating itself with the conclusion reached by and the language used in the *Young* and *Terrebonne* cases. Indeed, what this Court said at the time it imposed sentence on Harris and his co-defendants expresses its view with respect to the claim that the offenses of which the defendants were convicted are not of sufficient gravity to justify the harshness of the penalty:

> [The defendants] supplied thousands of men, women and children with crack ... Juveniles were used on some substantial scale in the distribution of this cocaine. The members of the conspiracy possessed many weapons ... The Court must impose punishment for causing a deliberate breakdown of law and order ... [and to send] a message to others [that] if you bring large amounts of drugs into the District of Columbia for sale, and particularly if it operated with weapons and with violence, you will go to the penitentiary for a long time, perhaps for life....
>
> [I]t's been suggested ... that compassion or mercy is to be given to these young men ... but I am even more sorry for the victims of their action: people ... who were made slaves to crack addiction through the insistent and violent acts of these defendants, ... the victims of the crimes the addicts committed to get money for the crack that the defendants were dispensing ... [and] finally, for the little babies born to the mothers who became addicts while they were pregnant through the assistance and the pressure of these defendants—the babies who have permanent brain damage, strokes, seizures, defective organs, who suffer the agonies of withdrawal....

Tr. of proceedings on October 18, 1989, at pp. 2–5. On this basis, the Eighth Amendment claim is rejected.

■ Defendant also attacks his sentence on due process grounds, claiming that the Sentencing Commission guidelines arbitrarily limit the sentencing court's ability to determine a fair sentence and to individualize that sentence. The Court is not persuaded that the sentencing statute and the guidelines fail to mass muster under the Due Process Clause on this particular ground.

However, the Court held in *Roberts* that the statute and the guidelines suffer from other due process infirmities related to the *de facto* vesting of the sentencing power in prosecuting attorneys instead of in impartial judges, and the *Roberts* Opinion explains the reasoning underlying that conclusion in some detail. The Court has not changed its opinion in that regard. Indeed, it takes comfort from the fact that the high-level commission appointed by the Chief Justice of the United States to consider the long-range future of the federal courts recently came to conclusions which in significant respect parallels what this Court said in *Roberts*, as follows:

> Instead of achieving the congressional purpose of limiting and regulating sentencing discretion, the guidelines have actually had the perverse effect of trans-

ferring discretion from the court to the prosecutor, who then exercises the discretion outside the system ... The rapid increase in the caseload compounds the problem. It appears that some prosecutors (and some defense counsel), in turn, have responded by evading and manipulating the guidelines in order to induce the pleas necessary to keep the system afloat.

Federal Courts Study Committee Tentative Recommendations for Public Comment, December 22, 1989 at 62.

Nevertheless, the Court is cognizant of the fact that the Supreme Court only last year upheld the constitutionality of the sentencing statute, albeit against a different challenge. *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). The Court also notes that the government has appealed two of the dismissals resulting from the *Roberts* decision, and that these appeals are now pending in the Court of Appeals. In view of the fact that many sentences may have to be imposed before the due process challenges to the sentencing law are finally resolved, it is prudent from a judicial administration point of view to comply with that law at present notwithstanding the Court's view of its invalidity.

■ Accordingly, following the lead of the many courts, including this Court, which *sua sponte* stayed the effectiveness of their pre-*Mistretta* declarations of unconstitutionality of the sentencing law under similar circumstances,[33] this Court will likewise stay the effectiveness of its *Roberts* decision insofar as it broadly holds unconstitutional the sentencing law and the guidelines in their entirety, and it will, in this respect, continue to apply the statute and the guidelines pending disposition of the current appeals.

However, the Court does not stay its decision with respect to the special measures adopted by the U.S. Attorney for this District which augment the arbitrariness inherent in the statute and the guidelines. These special measures were not mandated by Congress, and they are for that reason not entitled to the same kind of deference from the courts. Moreover, these measures are not as widely applicable, and on that basis they would not create the same kind of practical problems in the event of an appellate reversal. Accordingly, in criminal prosecutions coming before it, the Court will continue to consider whether transfers occurred from the D.C. Superior Court to this Court which infringe on the defendants' due process or Speedy Trial Act rights, and where such infringements have occurred, it will take appropriate action.[34]

Inasmuch as the Court has stayed the effectiveness of its broad and general *Roberts* ruling, the motion of defendant Harris for a preclusion of the guidelines with respect to his sentence will be denied.

## APPENDIX

### Declaration of Charles J. Harkins Jr.

I, Charles J. Harkins, Jr., declare as follows:

1. I am an Assistant United States Attorney and the Deputy Chief of the Narcotics Section, Criminal Division of the United States Attorney's Office in the District of Columbia.

2. In April 1989, Attorney General Dick Thornburgh and Director William Bennett announced federal initiatives to assist the District of Columbia in the battle against violent crimes and drug abuse. Consistent with that announcement, the United States Attorney's Office began a review of all drug and weapon offenses pending in the Superior Court for the District of Columbia. The purpose of the this review was to determine whether any cases then pending in the Superior Court were matters that could appropriately be prosecuted in the

---

**33.** *See United States v. Brodie,* 686 F.Supp. 941, 955 (D.D.C.1988).

**34.** In accordance with its decision in *Roberts,* the Court will also continue to consider, when called upon to do so by a defendant, whether a prosecutorial decision not to move for a departure pursuant to section 3553(e) of the statute or section 5K1.1 of the guidelines may have been arbitrary or capricious.

United States District Court in the District of Columbia under the Comprehensive Crime Control Act of 1984, the Anti–Drug Abuse Act of 1986, and the Anti–Drug Abuse Act of 1988.

3. I conducted the review of the pending Superior Court matters and selected approximately forty cases to be brought in the United States District Court for the District of Columbia. Since the original review, I have selected an additional fifteen cases to be brought in the District Court. Decisions of the United States Attorney's Office to file charges in the District Court are being made without regard to whether the facts that place the defendant within the purview of an appropriate federal statute is known at the time of the initial charging decision or becomes known at a later time.[1]

4. In bringing these matters in the United States District Court for the District of Columbia, all decisions were made based upon the provable facts and circumstances available from a review of the material contained in each defendant's case jacket. Other than fugitives, I did not take into account any factor in the procedural history of any case in determining whether to charge it in District Court. I did not make any effort to account for the plea posture of these cases, nor did I intend to encourage a plea by these decisions. Similarly, I did not make any effort to account for the length of time that the cases had been pending for speedy trial purposes. I did not seek to learn whether there were any speedy trial problems in these cases or try to ascertain whether indictment in District Court would impact any such problem, if it existed. Nor has it ever come to my attention that any of the Superior Court cases were indicted in Superior Court to avoid the time limits set forth by the Speedy Trial Act, 18 U.S.C. Section 3161 *et seq.*

5. Each of these matters was also reviewed by other supervisors. Only after this review was a determination made to present the matter to a Grand Jury in the United States District Court. In order to avoid a strain on the judicial resources of the District Court, those cases in which it was decided to seek an indictment in federal court were indicted in a staggered fashion with respect to their Superior Court trial date.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 27th, 1989.

/s/ Charles J. Harkins, Jr.
Charles J. Harkins, Jr.
Assistant United
States Attorney

### ORDER

(U.S. v. Holland, Crim. No. 89–0342–01(HHG))

Upon consideration of defendant's motion to dismiss the indictment, the government's opposition, the evidence adduced at a hearing held on January 4 and 5, 1990, and the entire record herein, it is this 11th day of January, 1990, in accordance with an Opinion issued contemporaneously herewith

ORDERED that the motion be and it is hereby granted.

### ORDER

(U.S. v. Harris, Crim. No. 89–0036–02(HHG))

Upon consideration of defendant's motion for reconsideration of the denial of his motion to preclude application of the sentencing guidelines, the government's opposition, and the entire record herein, it is this 11th day of January, 1990, in accordance with an Opinion issued contemporaneously herewith

---

1. Often the quantity and type of controlled substances cannot be positively determined until after chemical analyses are performed by the Drug Enforcement Administration Mid–Atlantic Laboratory and copies of the chemist's reports are received by the United States Attorney's Office. The chemist's reports in the Superior Court are prepared based upon given trial dates, whereas the chemist's reports in cases in the District Court are based upon the thirty-day indictment date.

ORDERED that the motion be and it is hereby denied.