943 F.2d 52
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Paul J. ABRAMS (90-3973), Ulysses Greene, Jr. (90-3974),
Defendants-Appellants.
 Nos. 90-3973, 90-3974.
 United States Court of Appeals, Sixth Circuit.
 Aug. 23, 1991.
 
 Before RALPH B. GUY, Jr. and ALAN E. NORRIS, Circuit Judges, and BAILEY BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants, Paul Abrams and Ulysses Greene, Jr., appeal their convictions and sentences on the charges of possession with intent to distribute in excess of five grams of cocaine base (crack), in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and possession of a firearm during and in relation to the commission of a drug offense, in violation of 18 U.S.C. § 924(c).[1]
 
 
 2
 Defendant Abrams raises three claims of error on appeal: (1) the evidence was legally insufficient to support his conviction; (2) the trial court's decision to allow the opinion testimony of a police officer who had been qualified as an expert violated Fed.R.Evid. 704(b); and (3) the court's sentencing of defendant under the Federal Sentencing Guidelines violated his eighth amendment right to be free from cruel and unusual punishment, his fourteenth amendment right to equal protection, and his fifth amendment right to due process and fundamental fairness. Defendant Greene also raises constitutional challenges to his sentence and the following independent issues: (1) the district court erred in not granting a reduction in sentence for acceptance of responsibility and in enhancing the base offense level for obstruction of justice; and (2) defendant received ineffective assistance of counsel at the trial stage in violation of the sixth amendment.
 
 
 3
 Finding no error, we affirm.
 
 I.
 
 4
 On February 22, 1990, members of the Combined Agency for Narcotics Enforcement Drug Task Force executed a search warrant at a single family residence at 39 Oberlin, Montgomery County, Ohio. After announcing they had a search warrant, the officers forced open the door and entered the apartment. The front door opened into a small living room area, with a kitchen area adjacent and opposite the front door.
 
 
 5
 Officer Dennis Castle, an investigator from the Montgomery County Sheriff's Office, was the first officer through the door. Upon entering, he saw defendant Greene and Guy Abrams in the kitchen. Castle observed Greene throw what appeared to be two baggies containing a white substance to the floor, one landing next to and one in front of the refrigerator. He also observed Guy Abrams run from the kitchen toward a rear bathroom.
 
 
 6
 To the right of the door as the officers entered was a couch on which defendant Paul Abrams was seated. According to testimony by Castle, Abrams was seated so as to conceal his hands at his side. After twice warning Abrams to show his hands, and getting no response, Castle grabbed Abrams by the shirt collar and placed him on the floor. As Abrams stood up, currency fell from his lap to the floor. Castle subsequently observed a .38 caliber Derringer pistol on the couch where Paul Abrams' hands had been. Castle then turned his attention to the kitchen where he took Greene into custody, placed him on the floor, and handcuffed him. Other officers subsequently placed Paul Abrams in custody.
 
 
 7
 All three suspects were placed in the kitchen and searched. No additional weapons or drugs were found on their persons. Guy Abrams was released at this time.
 
 
 8
 A search of the house was then conducted by the officers. A fully loaded .38 caliber revolver was recovered from the coffee table where it sat in plain sight in front of the couch where Paul Abrams had been seated. A fully loaded 16 gauge shotgun was observed in the corner diagonally opposite from where Abrams had been seated. Additional loaded guns were found in other places in the house. In a closed drawer in the coffee table, Officer James Deschler, another of the participating officers, found a plate containing 22 pieces (19 grams) of a rock-like substance later identified as cocaine base (crack). The two baggies recovered from the kitchen contained an additional 22.44 grams of crack cocaine. Paul Abrams stated that the Derringer was his but the money was not. Greene asserted that the other guns and drugs were his, but that they were for personal use.
 
 
 9
 Greene and Paul Abrams were indicted on March 20, 1990, and agreed to a bench trial. At the trial, defendant Greene called John Jenkins as a witness. Jenkins testified that Greene and Abrams were users but not sellers of crack. During recess and prior to cross-examination of Jenkins, the prosecuting attorney advised the court and opposing counsel that Jenkins was an informant and that he had previously purchased crack from Greene in an undercover operation and that this sale was the subject of an audio recording. After an attorney was appointed to represent Jenkins, Jenkins was cross-examined. He then stated that Greene had purchased crack cocaine, but that he had never seen him sell it. He further stated that he faked a conversation with Greene by talking to himself, and that he had used his own drugs to give to the police.
 
 
 10
 Abrams and Greene were both found guilty. Abrams was sentenced to 97 months on count one, and also to a mandatory 60-month consecutive sentence required after conviction of the gun charge. Greene was sentenced to 121 months on count one and 60 months custody on the gun charge.
 
 II.
 
 11
 A. The Sufficiency of the Evidence Against Paul Abrams
 
 
 12
 Abrams argues that there is insufficient evidence to convict him of possession with intent to distribute. Rather, he says, he was "mere[ly] present" at the location when the search occurred and that he did not have either constructive or actual possession. We disagree.
 
 
 13
 The standard of review for claims of insufficient evidence in a criminal case is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); accord United States v. Pearce, 912 F.2d 159, 161 (6th Cir.1990), cert. denied, 111 S.Ct. 978 (1991).
 
 
 14
 In addition to the possession with intent to distribute charge, in violation of 21 U.S.C. § 841(a)(1), Abrams was also charged in the alternative with a violation of 18 U.S.C. § 2, the aiding and abetting statute.[2] It is well established that one who is indicted as a principal may be convicted on evidence that shows he only violated the aiding and abetting statute. "All indictments must be read in effect ... as if the alternatives provided by 18 U.S.C. § 2 were embodied in each count thereof." United States v. Lester, 363 F.2d 68, 72 (1966), cert. denied, 385 U.S. 1002 (1967); see also United States v. Young, 527 F.2d 1334, 1336 (5th Cir.1976) (18 U.S.C. § 2 "is an alternative charge to be read into every count, and one indicted as a principal may be revisited as a showing of merely aiding and abetting.").
 
 
 15
 Aiding and abetting requires that a defendant " 'in some sort associates himself with the venture, that he participates in it as something he wishes to bring about, and that he seeks by his action to make it succeed.' " United States v. Winston, 687 F.2d 832, 834 (6th Cir.1982) (citing Nye & Nisson v. United States, 336 U.S. 613, 619 (1949)); accord United States v. Lawson, 872 F.2d 179, 181 (6th Cir.), cert. denied, 110 S.Ct. 110 (1989). "Thus, it has been said that aiding and abetting involves (1) an act by a defendant which contributes to the execution of a crime; and (2) the intent to aid in its commission." Lawson, 872 F.2d at 181 (citation omitted).
 
 
 16
 Defendant is correct when he states that "mere presence" is not enough to convict under either charge. However, the evidence indicates that he not only was present in a drug-selling environment, but also that he was actively aware of the activities occurring around him, and that he himself was involved in those activities.
 
 
 17
 Abrams was found sitting in the living room next to a table on which there was a scale, calibrated in grams and typical of the type used by drug dealers. Within several feet were numerous loaded guns; on the table in front of him, a .38 caliber Smith & Wesson revolver; across the room, a sawed-off shotgun; and, in his possession, a Derringer pistol. Abrams admits ownership and possession of the Derringer, and this possession under the circumstances presented here provides circumstantial evidence of his involvement in a drug crime. Weapons are tools of the trade, insofar as drug distribution is concerned, and are kept on the premises from which distribution occurs, just like other drug paraphernalia.
 
 
 18
 There were plastic bags near Abrams feet, of the same type that contained the drugs thrown on the kitchen floor. More than 20 pieces of crack cocaine and a razor blade were found in the drawer of the coffee table next to where Abrams was sitting. Unlike the crack in the drawer, the crack in the kitchen was in large chunks. At trial, an expert testified that the amount of cocaine in the apartment, more than 41 grams, was more than is usual for personal use. When Abrams arose from the couch, money, totalling $455 in small bills fell to the floor, further circumstantial evidence of involvement in drug transactions. Finally, Officer Castle testified that six days before the search warrant was executed he went to the front door of the residence in an undercover capacity and the following dialogue took place:
 
 
 19
 I knocked at the door. Mr. Abrams answered the door. I asked for June, which is a nickname for Mr. Greene. He stated he wasn't there. I asked for a half. He stated he did not have any. I asked him if he could help me out, that I used to cop from them over on Crown Avenue. He says, no, we're all out.
 
 
 20
 And he said--I said, are you sure you can't help me out? And he says June will be back in a little bit with--in about a half hour; come back in a half hour.
 
 
 21
 Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt. United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984); United States v. Adamo, 742 F.2d 927, 932 (6th Cir.1984) (citations omitted), cert. denied, 469 U.S. 1193 (1985). Presence combined with other evidence of guilt can be an adequate basis for a conviction. United States v. Schwartz, 666 F.2d 461, 463-64 (11th Cir.1982). It reasonably can be inferred from the evidence presented that Abrams knew about the quantity of crack cocaine in the house, that it was used for distribution purposes, and that he aided defendant Greene by providing protection or by handling money from drug sales and by dealing with drug customers in Greene's absence.
 
 B. The Expert Testimony
 
 22
 Defendant Abrams next asserts that the expert testimony by Officer Hunt concerning what amounts and types of drugs typical addicts in the Dayton area use, what types dealers use, and his opinion as to whether the cocaine in this case was held for ultimate consumption or for distribution, violated Federal Rule of Evidence 704(b).
 
 Rule 704(b) provides:
 
 23
 (b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did not did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.
 
 
 24
 The district court overruled the defendant's objection, offering the following explanation:
 
 
 25
 I'll overrule the motion to strike simply because I don't think a question to an expert witness "[b]ased on your experience, interviews, etcetera, have you an opinion as to whether this cocaine was held for ultimate consumption or distribution," I don't feel that that is, within the meaning of the rule, a mental state or condition. I think that deals with insanity. I think that deals with what we used to refer to as diminished capacity; he might not have the purpose or the ability to form a purpose or form an intent, which is a defense that we used to see quite often. And I think that's what's meant by mental state or condition. I think that's what's meant by an element of the crime where intent or purpose or culpable mental state is an element.
 
 
 26
 I think that the question that I didn't allow, which is, you know, "Why do these guys keep guns" comes a lot closer--even though that's not an element, comes a lot closer to the mental state or condition....
 
 
 27
 We agree with this interpretation. The notes of the advisory committee make clear that the "ultimate issue" rule was specifically abolished by Rule 704, with the one exception noted.
 
 
 28
 Defendant argues that Rule 704(b) is not limited to insanity issues or to defenses, but that it addresses the culpable mental state which is an element of the offense charged. He cites United States v. Cox, 826 F.2d 1518 (6th Cir.1987), cert. denied, 484 U.S. 1028 (1988), in this regard. Although we agree generally with defendants' suggested interpretation, we nonetheless find that Officer Hunt's testimony did not address the issue of whether defendant "had the specific criminal intent," id. at 1524, necessary for the charged crime. Rather, the expert stated his opinion only as it related to what types of conclusions might be drawn from the amount of drugs that were in the possession of the defendants.
 
 
 29
 C. Whether the Refusal to Deviate From the Guidelines Violates Defendants' Constitutional Rights
 
 
 30
 Both defendants claim that the Sentencing Guidelines are unconstitutional as applied in this case. They assert first that the Guidelines provide a harsher penalty for cocaine base (crack) than for powder cocaine, even though the two chemicals are scientifically equivalent and readily interchangeable. As a result, they maintain, the sentencing level assigned is grossly disproportionate to the offense, in violation of the eighth amendment and principles of fundamental fairness, and the district court should have departed downward from the Guidelines to the statutory minimum of five years. They further suggest that this inequity violates the equal protection guarantees of the Constitution because it unfairly prejudices lower income individuals, who are the primary users of crack cocaine.
 
 
 31
 As the district court accurately noted, this court has clearly rejected the eighth amendment argument that the penalty for crack is unconstitutionally disproportionate in comparison with that for cocaine powder.
 
 
 32
 [W]e must "grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishment for crimes." Salem v. Helm, 436 U.S. 277, 290 (1983). In United States v. Solomon, 848 F.2d 156 (11th Cir.1988) (per curiam), the Eleventh Circuit held that the mandatory five year sentence for possession of five grams of crack under 21 U.S.C. § 841(b)(1)(B)(iii) did not violate the prohibition of disproportionate sentencing under the eighth amendment. In Solomon, the Court implicitly held that a one to one hundred ratio was not disproportionate, because the Court found the case "indistinguishable" from the previous Eleventh Circuit approval of a mandatory five year term for possession of 500 grams of simple cocaine in United States v. Holmes, 838 F.2d 1175 (11th Cir.1988) (upholding 21 U.S.C. § 841(b)(1)(B)(ii) under the eighth amendment). 848 F.2d at 157. In enacting stiffer sentences for crack cocaine, Congress apparently intended to combat what it perceived to be the greater danger of crack cocaine. Brown, 859 F.2d at 977; 132 Cong.Rec. 8091 (comments of Senators Mattingly and D'Amato) (June 20, 1986); see also United States v. Ryan, 866 F.2d 604, 609 (3d Cir.1989) (stating that Congress passed the Act in order to severely penalize possession of crack as "a particularly insidious and dangerous drug"). The sentence ... while severe[ ] is not cruel and unusual under the eighth amendment.
 
 
 33
 United States v. Avant, 907 F.2d 623, 627 (6th Cir.1990). See also United States v. Pickett, --- F.2d ---- (6th Cir.1991), No. 90-3594 (Filed August __, 1991). We have stated further that "[t]his argument is baseless. There have been only three recognized instances of disproportionality rising to the level of an eighth amendment violation.... A ten-year sentence for drug possession simply does not approach the same level of gross inequity." United States v. Levy, 904 F.2d 1026, 1034 (6th Cir.1990), cert. denied, 111 S.Ct. 974 (1991) (quoting United States v. Cyrus, 890 F.2d 1245, 1248 (D.C.Cir.1989)). Moreover, as the Eighth Circuit stated in United States v. Buckner, 894 F.2d 975 (8th Cir.1990), a case cited approvingly by this court in Levy:
 
 
 34
 To a substantial degree, our perceptions of crimes, their heinousness, and the dangers they pose to society dictate the punishment we impose.... [W]e are cognizant of the message Congress intended to send to society by creating comparably stiff penalties for offenses involving cocaine base. By these penalties Congress sought to reshape society's perceptions about the seriousness of particular drug offenses. It hoped to convey the message that drug use was malign, not benign. It also sought to show that cocaine base posed a threat to individuals and to the very fabric of our society.
 
 
 35
 To accomplish this end, Congress explicitly selected a higher penalty for crimes involving cocaine base than previously might have appeared appropriate.
 
 
 36
 Id. at 980. We find no merit in defendants' purported distinction between Levy, which dealt with the constitutionality of the sentencing provisions, and the instant case, which deals with a request for deviation from the Guidelines. The Guidelines were enacted pursuant to the statute and are in conformity in purpose and structure.
 
 
 37
 We also find no support for defendants' claim that the harsher penalty for crack violates the equal protection or due process guarantees of the Constitution. Defendants claim that the differing penalties for crack and powder cocaine unfairly impact the poor, who are more predominant users of crack. As we noted in Avant, "the Act, a federal statute, does not violate equal protection because the equal protection clause of the fourteenth amendment applies to state action." Avant, 907 F.2d at 627.
 
 
 38
 We review acts of Congress with considerable deference. Acts do not offend principles of substantive due process if they bear a "reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory." Nebbia v. New York, 291 U.S. 502, 537 ... (1934). Appellate courts should not and do not try "to determine whether [the statute] was the correct judgment or whether it best accomplishes Congressional objectives; rather, [courts] determine [only] whether Congress' judgment was rational."
 
 
 39
 Buckner, 894 F.2d at 978 (footnote omitted).
 
 
 40
 In the Anti-Drug Abuse Act of 1986, Congress amended 21 U.S.C. § 841(b)(1)(B) to provide longer sentences for offenses involving mixtures weighing 500 grams or more that contain cocaine hydrochloride (powder) or mixtures weighing 5 grams or more that contain cocaine base. It is undisputed that Congress amended the statute out of concern that cocaine base is "more dangerous to society than cocaine [powder] because of crack's potency, its highly addictive nature, its affordability, and its increasing prevalence."
 
 
 41
 Levy, 904 F.2d at 1032 (quoting Buckner, 894 F.2d at 978). This court recently elaborated on this point:
 
 
 42
 We believe for two reasons that Congress's act was sufficiently rational to meet the demands of substantive due process. First, presuming as [defendant] does that Congress's sole purpose in enacting the ratio was to discourage drug addiction, then the ratio can stand only if it is plausible to believe that the likelihood of becoming addicted to crack is greater than that of becoming addicted to cocaine. We believe that there is sufficient difference of opinion in the scientific community regarding the different likelihoods of becoming addicted to crack or cocaine to justify the Congressional distinction between the two. The government offered evidence at [defendant's] sentencing hearing that experts believe that the speed with which crack gets to the brain produces a significantly different effect that increases the likelihood of addiction. There was also evidence produced that crack is usually a purer drug than is cocaine. Such evidence was presented at the Congressional hearings. See Buckner, 894 F.2d at 978 n. 9 (quotes from the Congressional testimony of Dr. Robert Byck). The mere fact that Nittskoff has a competing theory that addiction levels vary more with dosage and purity than with method of ingestion does not preclude Congress from disagreeing with him.
 
 
 43
 Congress could also have had another purpose behind the ratio than the simple suppression of drug addiction. Congress was clearly concerned that the special attributes of crack--its small size and cheap price per dose--could create other societal problems that required remedying. Senators noted that because crack is sold in small doses (called "rocks") it is easier to transport and use, thereby increasing the difficulty of suppressing addiction. The cheap price of each "rock" also permits children to afford cocaine for the first time, thereby exposing another segment of American society to drug addiction. See Buckner, 894 F.2d at 978 n. 9 (citing statements of Senators Bumpers and Kennedy, 132 Con.Rec. S14282, 14293). Given these problems caused by the special qualities of crack, it was not irrational for Congress to determine that sharply stiffer penalties for the sale and distribution of crack were necessary to counterbalance the lure of profit that would otherwise attract persons into the crack trade.
 
 
 44
 Pickett, --- F.2d at ----, No. 90-3594 (Filed August __, 1991). This language clearly demonstrates that Congress had a rational basis for passing this law that was reasonably related to its objective of protecting the public from the popular and potent new form of cocaine--crack.
 
 
 45
 Finally, defendant Abrams suggests that his mandatory minimum sentence under the Guidelines is more than twice that which he would have faced if subject to state prosecution. He cites United States v. Williams, 746 F.Supp. 1076 (D.Utah 1990), as support for the proposition that the manner in which the defendants were referred for federal prosecution violated his due process rights.
 
 
 46
 At issue in Williams was the legitimacy of the referral for federal prosecution by a local narcotics strike force, an intergovernmental law enforcement group composed of state and federal agencies. The strike force referred its cases to federal prosecutors, although no federal prosecutor was a member of the governing board or had any part in the determination to refer the cases to federal prosecution. The Utah district court held that the referral policy "fosters an atmosphere where this decision can be based upon inappropriate and capricious factors, violative of these defendants' Constitutional rights to due process of law." Id. at 1083.
 
 
 47
 When an individual violates a law for which there are prohibitions at both the state and federal levels, we know of no constitutional protection which allows him to choose prosecution under one or the other of the systems, depending on which provides the lesser penalty. In today's overcrowded court system it is not uncommon for drug cases, which could be prosecuted under either federal or state law, to be adjudicated in federal court. "This Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." United States v. Batchelder, 442 U.S. 114, 123-24 (1979). Although the Court in Batchelder was addressing possible prosecution under two federal statutes, the principle enunciated applies to prosecutive choices made between state and federal laws as well.
 
 
 48
 Although the [existence of both] statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments. So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirement of the Due Process Clause are satisfied.
 
 
 49
 Id. at 123.
 
 
 50
 Similarly, we find no evidence in this referral for federal prosecution of the kind of abuse discussed in recent district court decisions from the District of Columbia which are cited by the defendant.[3]
 
 
 51
 D. The Court's Enhancement of Greene's Sentence and its Refusal to Adopt a Reduction for Acceptance of Responsibility
 
 
 52
 Defendant Greene contends that pursuant to section 3E1.1. of the Sentencing Guidelines he is entitled to a two-point reduction in the computation of his sentence for acceptance of responsibility. He asserts that the presentence report, in effect, recommended such a downward departure when it stated that the defendant acknowledged possessing the weapons and possessing drugs for his own use and selling them only to finance such usage.
 
 
 53
 Great deference is given to the trial court with regard to acceptance of responsibility determinations, and the sentencing judge's decision should be sustained unless it is clearly erroneous. United States v. Wilson, 878 F.2d 921, 923 (6th Cir.1989); see U.S.S.G. § 3E1.1, comment. (n. 5).
 
 
 54
 Whether or not a defendant has accepted responsibility for his crime is a factual question. The Sixth Circuit has held that "when a defendant seeks to establish facts which would lead to a sentence reduction under the Guidelines, he shoulders the burden of proving those facts by a preponderance of the evidence." United States v. Rodriguez, 896 F.2d 1031, 1032 (6th Cir.1990).
 
 
 55
 In denying the two-point reduction, the district judge stated:
 
 
 56
 I do note that the probation officer did recommend the granting of two points for acceptance of responsibility. I feel, with all due respect, that that is not appropriate here since the Defendant indicates that the drugs in the house at 39 Oberlin were for his own use and not for sale and that while the guns belonged to him and Abrams--or they were with him--they were not used to facilitate or during a drug-trafficking offense. Accordingly I simply do not find that that equates to an acceptance of responsibility.
 
 
 57
 We are unable to say that the district court's conclusion that Greene did not accept responsibility is clearly erroneous.
 
 
 58
 Greene also argues that the trial court's enhancement of his base offense level for obstruction of justice because he suborned perjury was in error. The district court concluded Jenkins's perjured testimony to have been within defendant Greene's knowledge. In sentencing the defendants, the court stated:
 
 
 59
 This Court has previously set forth its firm conviction and conclusion that there was perjury in this case through the testimony of the Witness John Jenkins, and this Court advised the Defendants' Counsel about a week or two ago that it intended to apply to each Defendant a two-point enhancement for obstruction of justice. And the Court based its feeling that--withdraw that.
 
 
 60
 "Obstruction of justice" can be defined in many different ways, but one of the ways set forth in Title 18 United States Code, Section 1512, states that obstruction of justice occurs whenever one knowingly uses or engages in--withdraw that--whenever one knowingly uses or corruptly persuades another person with intent to influence the testimony of any person in an official proceeding.
 
 
 61
 The Defendants have written what I think to be excellent memoranda against the two-point enhancement, and they point out that the perjury, if in fact there was perjury, occurred on cross examination. I don't accept that basic premise for this reason: The perjury might not have become obvious until cross examination, but the cross examination revealed sufficient defects in the credibility of Mr. Jenkins to not only cast doubt on the credibility of his direct testimony but also leave the Court with the firm conviction that perjured testimony was offered.
 
 
 62
 .............................................................
 
 
 63
 ...................
 
 
 64
 * * *
 
 
 65
 With regard to Mr. Greene, I regret to say the conclusion is different. Mr. Greene called this witness. I think a reasonable inference could be drawn, certainly sufficient to prove by a preponderance or greater weight of the evidence, that Mr. Greene had some idea of what it was that Mr. Jenkins was going to say. I think it safe beyond a shadow of a doubt to assume that there cannot be perjury committed during the course of a trial without someone suborning that perjury. Witnesses who are about to perjure themselves simply do not simply volunteer to testify and arrive in court without being asked to testify by the party calling. So the two-point enhancement will not be applied with respect to Mr. Abrams. It will with respect to Mr. Greene.
 
 
 66
 Section 3C1.1 of the Guidelines provides that "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels." The accompanying commentary notes that suborning or attempting to suborn perjury offers a basis for such an adjustment. U.S.S.G. § 3C1.1, comment. (3(b)).
 
 
 67
 Greene asserts that the perjured testimony was of the witness own initiative and, as a result, he should not be penalized. Additionally, Greene suggests that the witness Jenkins may have been suffering from "drug burnout" as a result of his long-term use, which may have caused his conflicting testimony. We do not find this argument convincing or the district court's conclusion to the contrary to be clearly erroneous, and we affirm.
 
 
 68
 E. Greene's Ineffective Assistance of Counsel Claim
 
 
 69
 Finally, Greene argues that the representation he received in the trial court was ineffective and therefore violated his sixth amendment right to counsel. We note that, as a general rule, a defendant may not raise such claims for the first time on appeal, since there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations. United States v. Hill, 688 F.2d 18, 21 (6th Cir.), cert. denied, 459 U.S. 1074 (1982); United States v. Swidan, 888 F.2d 1076, 1081 (6th Cir.1989). The customary procedure followed in this situation by the various circuits is to permit the defendant to raise his ineffectiveness of counsel claim in a proper post-conviction proceeding under 28 U.S.C. § 2255.
 
 
 70
 Nevertheless, even considering this claim, we find it to have no merit. In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court set forth the two-prong test by which ineffective assistance of counsel claims should be reviewed:
 
 
 71
 A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 
 
 72
 Id. at 687. The opinion further states: "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances[ ] [and] [p]revailing professional norms of practice[.]" Id. at 688.
 
 
 73
 Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.
 
 
 74
 Id. at 689. See also Krist v. Foltz, 804 F.2d 944, 947 (6th Cir.1986). Applying this standard to the facts concerning counsel's representation in the present case, we find no violation.
 
 
 75
 Greene's primary evidence of ineffective assistance of counsel is that his attorney did not know that the witness Jenkins was the informant referred to in the search warrant as having purchased crack cocaine from Greene. Had he known this, his counsel would not have used Jenkins as a witness or would have questioned him differently. Greene further states that the prosecutor's failure to disclose this fact was a violation of Brady v. Maryland, 373 U.S. 83 (1963). We disagree in both instances.
 
 
 76
 In United States v. Presser, 844 F.2d 1275, 1281 (6th Cir.1988), this court stated that "the Brady doctrine, in its purest form, is the rule of law that the Due Process Clause is violated when the government ... withhold[s] evidence 'so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce[.]' " Id. (citations omitted; footnote omitted). The obligation is
 
 
 77
 to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment.... [A] majority of this Court has agreed, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."
 
 
 78
 Id. at 1281. (citing Pennsylvania v. Ritchie, 480 U.S. 39 (1987)). "[T]he Court dismissed an argument that the definition of material evidence under the Brady rule should 'focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence.' " Id. at 1282 (citing United States v. Agurs, 427 U.S. 97 (1976) (emphasis supplied)). In the present case, the evidence in question would not have served to exculpate the defendant, but merely would have changed his trial strategy. As such it is not Brady material. Moreover, the situation defendant outlines is not a Brady violation because Brady does not apply to situations where defendant is already aware of the facts. United States v. Todd, 920 F.2d 399, 404-05 (6th Cir.1990). In this case, Greene clearly knew of the earlier sale of crack cocaine to Jenkins.
 
 
 79
 Greene next argues that he was deprived of adequate assistance because his attorney did not move to suppress the evidence seized pursuant to the search warrant. He submits that since Jenkins' credibility on the stand was at issue it should have been apparent to defense counsel that he was not a reliable informant for the search warrant and, thus, the seizures were in violation of the fourth amendment. However, the Jenkins' testimony concerning the purchase of crack from defendant Greene served only to corroborate the statements made by the police used to support the issuance of the search warrant. Therefore, the attorney's decision not to challenge the credibility was well within his discretion in formulating a trial strategy.
 
 
 80
 Finally, Greene suggests that his counsel's ineffectiveness was illustrated by Judge Rice's disgruntlement over Jenkins's perjured testimony and his attorney's subsequent failure to move for a mistrial. He asserts that Judge Rice could not have remained able to serve impartially after such conduct.
 
 
 81
 A judge's comments must be viewed in the context in which they are made. See United States v. Morrow, 923 F.2d 427, 430 (6th Cir.), rehearing granted, 932 F.2d 1146 (1991). We see nothing in Judge Rice's comments which would indicate that he was unable to proceed in an impartial manner. In fact, he specifically stated that the perjury by Jenkins had no bearing on the guilt or innocence of the defendant. As the Strickland test makes clear, a conviction will not be overturned unless a defendant can show that but for counsel's deficient actions the defendant likely would not have been convicted. See Morrow, 923 F.2d at 430. That is not the case here.
 
 
 82
 AFFIRMED.
 
 
 
 [1]
 Defendant Abrams was charged with possession of a loaded .38 caliber Derringer handgun, while defendant Greene was charged with possession of a loaded .38 caliber Smith & Wesson revolver
 
 
 [2]
 18 U.S.C. § 2 reads as follows:
 § 2. Principals
 (a) Whoever commits an offense against the United State or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 
 
 [3]
 In United States v. Roberts, 726 F.Supp. 1359 (D.D.C.1989), modified, United States v. Holland, 729 F.Supp. 125 (D.D.C.1990), the district court found the Sentencing Guidelines unconstitutional as they applied to the unique situation in the District of Columbia where the United States Attorney has the choice of prosecuting in a D.C. Superior Court or a federal district court forum, and in which he allegedly chose the federal forum because of its potentially harsher penalties or pressured defendants to accept plea bargains to avoid such prosecutions. This decision was recently reversed in United States v. Mills, 925 F.2d 455 (D.C.Cir.1991). See also United States v. Thomas, 884 F.2d 540 (10th Cir.1989) (reaffirming the legitimacy of the exercise of prosecutorial discretion in connection with the Sentencing Guidelines against a claim of violation of due process of law)